[Crim. No. 2122. Second Appellate District, Division Two.—December 7, 1931.]

THE PEOPLE, Respondent, v. CUSTODIA MURILLO, Appellant.

Frank J. McCarthy and Patrick F. Kirby for Appellant.

U. S. Webb, Attorney-General, and Frank Richards, Deputy Attorney-General, for Respondent.

THOMPSON (IRA F.), J.—This is an appeal from a judgment sentencing the defendant for murder in the second degree and from an order denying her motion for a new trial.

It is a sad and, if the jury be right, a most unnatural case. The appellant is the mother of the girl she was found guilty of murdering. The following testimony was introduced and is now said to support the verdict: On December 20, 1930, the appellant went to the undertaking parlor of Enrique Cloret, in Belvedere, and informed one C. D. Ramirez that her daughter two years of age was dead, and that she wanted him to care for the body. Ramirez asked her for the name of her doctor and was informed that she had none, whereupon Ramirez said that it would be necessary for him to notify the coroner's office. The appellant then told Ramirez that if he could not make arrangements to care for the child not to take the body to the coroner's; that she feared "to have the difficulties"; and that the child had died as a result of a fall from an automobile in which she (the appellant) had been taking her daughter to the hospital a week before. Jessie Flores, a witness for the People, testified that she lived in a part of the same house occupied by appellant during the months of May, June and July of 1930; that appellant during those months beat the child "two or three times a day", sometimes using her fists and at other times a stick and on one occasion a bottle; that with the bottle she struck the child on "the back of the neck" or "back (t)here some place" and then grabbed her by the hair of the head and pulled her into the house. The witness immediately following this occurrence asked appellant why she was so mean to the little girl and was informed by appellant that "she did not like her"; that she hated her; that she wished she could "see her dead"; and that she would "get rid of her".

The most damning evidence, however, consists of pictures which were introduced in evidence and which have been transmitted to this court. They show the little body literally

covered with cuts, scratches and bruises. Dr. Wagner, who performed an autopsy, testified as follows: "I found numerous contusions, abrasions and superficial lacerations on the head, face, shoulder, arms, back and lower limbs, some of which were a week or more old, and a few very recent. There was a large, deep-seated abscess on the outer, posterior aspect of the right arm, which, on section was filled with about two ounces of yellow pus. The right knee was considerably swollen and discolored, and on opening the area I found inflammatory exudite mixed with pus in and around the joint. I opened the head and found no visible injury of the brain or skull. I opened the body and found all the organs free from disease, but of a slight yellowish hue." He further said that the yellowish hue was caused by "the infection which the child suffered from these wounds", that "The cause of death was contusions and abscesses following injuries upon various parts of the body"; but that it was contributed to by the very many bruises, and further gave it as his opinion that the injuries resulting in pus had been inflicted about four days before. The appellant told the officers that the bruises were caused by the child falling out of an automobile on the Monday prior to its death, at about the hour of 10 o'clock A. M.; that she was taking her daughter to the hospital in the Dodge automobile belonging to Sam Vasquez or Jose, his brother, the man "living with her as husband" when she fell out; that due to the excitement she put the child back in the car and drove home but did not call a doctor. However, Sam Vasquez, who did own the Dodge touring car, and Careno A. Cayeto and Pablo Talamantes all testified that they three were working at the Midwick Country Club and used the car every day in December until after the 20th, leaving at 6 A. M. and not returning until after 4:30 P. M. and that on none of these days did the appellant drive them to work or have the use of the car.

We now come to that part of the testimony upon which the appellant especially relies and which we may properly say, introduces an element of confusion if not uncertainty into the situation. The child was first admitted to the general hospital on June 18, 1929, at which time it was six months and three weeks old and weighed nine pounds and nine ounces. According to the testimony of the physicians

she was suffering at the time with lobar pneumonia of the right upper chest, rickets, malnutrition and some skin infection. During this first stay at the hospital both ears became infected and were lanced. She was discharged therefrom as cured on August 28, 1929, in care of an assistant probation officer, who placed her in a boarding home at Wilmington, and at the time weighed thirteen pounds three ounces. During the child's stay at the boarding home it broke out with a rash, but at the time of its redelivery to the mother, on April 21, 1930, it seemed to be in good health. In July of the same year the assistant probation officer called at the home of appellant and saw the child, at which time also she seemed to be in "fair condition". However, the next time she saw the little girl she had sores on her face and she believed "on the hands" and a "sort of a swelling in one ankle". This probation officer did not see her again until October. However, a Miss Ryden, a nurse of the county health department, attached to what is known as the Mara Villa Health Center, saw the child several times in August. On the fifteenth day. of that month the appellant took her daughter to the health center and Miss Ryden describes her condition at that time by saying that she was an undernourished child not yet two years old; that she had an infection in the upper part of her fingers. The nurse bandaged the fingers and told the appellant to keep them bandaged so that the child could not scratch at the sores and also that there was a suspicion of tuberculosis and for that reason it would be well to keep the child isolated. Pursuant to this suggestion the baby was put into a very rude shed constructed out of scraps and open on one side. At a later suggestion of the nurse the child's hands were tied down. On Sunday, September 6th, while the appellant was taking a walk with the child's stepfather (the identity of her own father is not clear from the record) some of the neighbors found the girl lying on a board in the shed with its little hands tied down. They summoned officers and she was taken again to the general hospital. Her condition at that time was very poor. She was dehydrated, rachitic and emaciated, due in the opinion of the physician to a deficiency of diet or malnutrition. She was unhygienic with "numerous contusions and abrasions all over the hands" and according to the

nurse all over her body. She again had an infection in the ear. And here is an outstanding fact: According to the mother the child would not drink milk, but when taken to the hospital on this occasion she was very hungry on being received into the admitting room. In order that we may convey the exact thought of the witness—a nurse at the hospital—we here set down the testimony *verbatim:*

"Q. I will ask you if you gave the child at that time anything to drink? A. Yes, we did. We gave her, we offered her some water, and she drank it so greedily that we went upstairs and got her some hot cocoa, and she had about eight cups of cocoa. Q. Eight cups of cocoa in what space of time? A. Just about as fast as she could drink it. Q. How many ounces in a cup of cocoa? A. About four. Q. So she drank how many cups of cocoa? A. About 32 ounces of cocoa and a cup of water and four graham crackers. That is what we gave her in the admitting room."

Dr. Pedlow also testified that the child was given about two cups or eight ounces of milk in the admitting room within the space of about twenty minutes and that she requested the nurses to give it no more. The records also disclose that during this stay in the hospital she took milk regularly. She was again discharged to the mother on October 4, 1930, or a little more than two months before her death.

The appellant claims (1) that there was not sufficient proof of the *corpus delicti* to warrant the admission into evidence of the extrajudicial statements of the defendant; (2) that the evidence is not sufficient to sustain a conviction for any crime; (3) that if sufficient for any crime certainly none greater than that of manslaughter; and (4) that the court erred in three instructions given to the jury.

On account of the unusual character of the case we have set forth the testimony with considerable detail. ■ From that recital, and aside from any admissions of the appellant, sufficient appears to have warranted the jury in finding that the child's death was caused by injuries inflicted upon the child at various times; that those injuries were inflicted by the mother who was seen to beat the child two or three times a day some five or six months before her death, sometimes with her fists, sometimes with a stick and once with a bottle. There is another significant fact.

Under proper care and feeding the child flourished. Under the mother's care she languished and became dangerously ill. Assuming for the purpose of argument that the proof, exclusive of the statements and admissions of the defendant, does not indicate beyond a reasonable doubt that the child did not die of natural causes, yet certainly there was sufficient evidence to establish, *prima facie*, the criminal agency. Such proof is all that is required before the introduction of the extrajudicial statements. *People* v. *Selby*, 198 Cal. 426 [245 Pac. 426], is squarely in point and conclusive upon appellant.

■ When we consider her statement that she hated the child; that she was going to get rid of her; her false recital of the manner in which the baby was bruised and scratched, and her fear of difficulties if the coroner had to be consulted, together with the other facts, it can scarcely be said that the argument of appellant that the testimony is not sufficient to sustain the verdict, merits further comment.

■ The contention with respect to the instructions is that in three of them the trial judge trespassed upon the functions of the jury by indicating therein that there was no doubt in his mind that the defendant was guilty. There is no substantial foundation for the assertion. The instructions dealt particularly with the subjects of intent, moving cause and identity of the defendant, and correctly declare the law with respect thereto. The jury, when considering the instructions as a whole, could not possibly have been misled or have gained from the instructions an idea that the judge had any belief concerning the guilt or innocence of the appellant.

Judgment and order affirmed.

Works, P. J., and Craig, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 21, 1931, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 4, 1932.