[Crim. No. 2570.   Third Dist.   Feb. 1, 1955.]

THE PEOPLE, Respondent, v. ALBERT CAMARGO, Appellant.

Paul S. Garstang for Appellant.

Edmund G. Brown, Attorney General, Doris H. Maier and F. G. Girard, Deputy Attorneys General, for Respondent.

WARNE, J., pro tem.*—Appellant was accused by three counts of an amended indictment with involuntary manslaughter of his infant son, in violation of section 192, subdivision 2, of the Penal Code. Count I alleges a violation of the Penal Code section, with the additional words "while wilfully causing or permitting said child to suffer." Count II (alternative) alleges a violation of the same subdivision of the Penal Code section in the language of the statute, and adds the words "while inflicting upon said child unjustifiable physical pain." Count III (alternative) also alleges a violation of said Penal Code section and said subdivision in the words of the statute with the additional words "while permitting or causing the life or limb of such child to be endangered." Appellant was tried by a jury and acquitted upon the first and second counts, and was convicted upon the third. Motions in arrest of judgment and for a new trial were made by the appellant, and denied by the court; however, sentence was suspended and appellant was granted probation. Appellant appeals "from the judgment therein entered . . . on the 25th day of June, 1954, and from an order denying a new trial, and from the whole thereof." Since no judgment was entered or pronounced, the

*Assigned by Chairman of Judicial Council.

order granting probation must be deemed to be the final judgment for the purpose of this appeal. (Pen. Code, § 1237, as amended in 1951.) It is apparent that such was the intent of the appellant because he starts his opening brief with the caption: "Appeal from the order granting probation . . . and from the order denying defendant's motion for a new trial." ▮ In the case of *People* v. *Robinson,* 43 Cal.2d 143 [271 P.2d 872], the court laid down the following rule: "A notice of appeal will be liberally construed to permit a hearing on the merits and avoid a dismissal because of some technical defect or irregularity." We will therefore construe the notice as an appeal from the final judgment as well as the order denying the motion for a new trial.

Appellant contends that the evidence is wholly insufficient as a matter of law to support the verdict of the jury finding defendant guilty of manslaughter, and also that the corpus delicti of manslaughter was not established by the prosecution.

Appellant's 2 months' old infant son died in his mother's arms at approximately 3 o'clock in the afternoon of February 14, 1954, as he was being rushed to an Oroville hospital by his parents. On the following morning an autopsy, performed by a doctor who specialized in pathology, revealed the infant's death had been caused by a brain concussion with traumatic intracranial hemorrhages; i.e., hemorrhages of the brain produced by violence. The autopsy surgeon also testified that the deceased baby had suffered multiple bruises in the vicinity of the head and face, including one across the top of the scalp which measured ½ by ⅜ inches. some of the bruises around the left eye were associated with small lacerations of the skin. There were six external injuries on the body. He also testified that the deceased baby had suffered a number of serious and severe injuries including a potentially fatal rupture of the liver. Eleven ribs had been broken, and there was extensive hemorrhage area surrounding the brain. There was bleeding in the lung and beneath the lining of the lung cavity on the right side beneath the area of injury. There were also hemorrhage areas in the heart, kidneys, adrenal glands, bladder, rectum, thalamus, breast bone, and larynx. The doctor further testified that the pathological studies which he made established that the brain concussion was sustained between 24 to 72 hours prior to the death; that the injury to the lungs and the liver was

nearer 72 hours prior to the death, and the ribs had been broken many hours or days prior to death. He also testified none of the injuries could have been caused within one hour or less prior to death. The medical testimony in respect to the time element is of special significance because it was the theory of the prosecution that severe and multiple injuries had been inflicted upon the baby by the appellant over a period of several weeks. In support thereof evidence was introduced that appellant on several occasions endeavored to ''exercise'' and ''toughen up'' his young son by dropping him on a bed, bouncing him up and down, throwing him into the air, holding him up by the thumbs, and squeezing him until his head turned reddish purple. Appellant denied any mistreatment in his handling of the infant, but admitted that in playing with him he bounced him up and down on the bed, and that he once suspended him by the thumbs to demonstrate his strength. Appellant disclaimed any intent to harm his child, and all of the witnesses admitted that he never displayed any anger towards the baby or seemed to feel that he was being brutal. At the trial appellant and his wife testified that on the afternoon, between 1 and 3 o'clock, preceding the baby's death, the appellant accidentally dropped him on his head on the floor, but that the baby did not seem to suffer any ill effects therefrom. Later on, around 7 o'clock or a little later, they attended a show and took the baby with them. During the time that the child was in the show there was nothing unusual about its behavior; however, they testified that the following afternoon the baby suddenly became seriously ill and discharged a quantity of mucus from its nose and mouth, struggled for breath and appeared to be choking to death; and that appellant tried to keep the baby breathing by slapping and spanking it vigorously and applying artificial respiration. When his efforts appeared to be unsuccessful, they started for the hospital to obtain medical aid, but the baby died just as they reached the hospital. In a statement made to the investigating officers four days after the baby's death, appellant stated that when the baby kept gasping for breath he became excited and must have hit him too hard. He claims he could not recall how many times he struck the baby, but ''it might have been a dozen, might have been a half a dozen. It seemed like everything happened so quickly.'' The prosecution contends that the baby's fatal injuries could not have been caused at that time, or on the preceding afternoon when it

fell to the floor, as the autopsy surgeon testified that none of the serious injuries could have been incurred less than 24 hours prior to death, and that the child could not have choked to death as there was no obstruction of the mouth, nose, windpipe or lungs, and that there was no abnormal amount of mucus which should have been present if the baby had had the seizure or attack described by appellant and his wife. However, there was no testimony as to whether or not such a fall to the floor, approximately 24 hours before death, could have caused the fatal brain concussion. It is appellant's contention that it did, and he testified at the trial that he could not explain the broken ribs and other external injuries other than that they were incurred when he endeavored to give the baby artificial respiration. A Mrs. Maynard was called by the prosecution as a witness, and testified that she was employed at appellant's home, commencing on Monday, the 18th of January, to and including Friday, the 22d. She testified that the first night she was in the kitchen and heard a terrific pounding on the bed in the bedroom, and an impact, and immediately thereafter the baby screamed like it was being hurt. At this time the witness further testified that the same evening the appellant held the baby on his lap, and squeezed him. "I could see the top of the baby's head. He held it until it didn't cry any more, the cries got fainter and fainter until it stopped crying," and at that time the color of the baby's head changed to a deep red or purple. On the following day she remonstrated with appellant as to the treatment of the baby, and the occurrence was not repeated. This witness also testified that she saw appellant toss the baby in the air. "Whether it turned over more than once, I don't know, but I know it left his hands and he caught it again." She also testified that once when appellant was holding the baby she "saw him pull back his hand like that" (indicating) "and then I heard an impact and the baby cried. I couldn't see him hit—strike the baby." However, Mrs. Maynard admitted that she never could see any bruises on the baby although she particularly looked. There was no testimony that the events which she related caused or could have caused the fatal brain concussion from which the baby died three weeks later. To the contrary, as noted above, the autopsy surgeon testified that it was incurred between 24 and 72 hours prior to death, and appellant's family physician, who examined the baby five days before its death, testified at that time it

was growing, doing fine, did not show any evidence of mistreatment, and that he certainly would have known at that time if it were suffering from any internal injuries.

We agree with appellant's contention that it cannot be inferred from the evidence of his conduct three weeks prior to the baby's death, as testified to by Mrs. Maynard, that the fatal injuries were then inflicted. In fact there is no evidence of the baby having suffered any injury at that time. It is also true that although both the corpus delicti and the defendant's guilt can be proved by circumstantial evidence (*People* v. *Murillo,* 119 Cal.App. 59, 63-64 [5 P.2d 897]; *People* v. *Cullen,* 37 Cal.2d 614, 624 [234 P.2d 1]; *People* v. *Huizenga,* 34 Cal.2d 669, 675-676 [213 P.2d 710]; *State* v. *Kader,* 201 Ore. 300 [270 P.2d 160]; *State* v. *Plunkett,* 62 Nev. 258 [149 P.2d 101, 107]), there must be evidence from which it can reasonably be inferred that the external force or violence causing the death was applied by another and was not self-inflicted or the result of an accident. (*Hall* v. *Superior Court,* 120 Cal.App.2d 844, 849 [262 P.2d 351].) On the other hand, appellant admitted that between 1 and 3 o'clock on Saturday afternoon, he accidentally dropped the baby on its head on the floor, which was not less than 24 hours prior to its death at approximately 3 o'clock on Sunday afternoon. It was within the time the autopsy surgeon testified the fatal brain concussion was sustained. While we believe that it could be reasonably inferred that the fall on Saturday was the external force which caused the fatal brain injury, we also feel that it could be reasonably inferred that appellant dropped the baby, not as he testified when he was reaching for a spoon, but while engaged in the same kind of maltreatment he had been seen to inflict upon it, such as bouncing the baby up and down on the bed, tossing it into the air and catching it in his hands, and squeezing it to stop its crying. There was evidence of a course of conduct in the handling of the baby which, coupled with the serious injuries which it had received, would warrant the jury in concluding that the child had been injured by such conduct. The baby's injuries themselves speak loudly to the point. Further, there was admitted in evidence, without objection, the statement made by appellant to the investigating officers four days after the baby's death, wherein he admitted that his handling of the baby had resulted in its death. Said he: "I know whatever I done was wrong. I killed my son." The jury was not

compelled to accept the testimony of either the appellant or his wife given at the trial. By its verdict it rejected appellant's contention and inferred that appellant's unlawful treatment of the infant occasioned its many injuries and its death. ■ As the inference drawn from the direct and circumstantial evidence presented was a reasonable one, the jury's conclusion will not be disturbed on appeal. (*People* v. *Clark*, 116 Cal.App.2d 219, 223 [253 P.2d 510].)

■ In *People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778], the court sets forth the standard which appellate courts must follow where there is evidence, circumstantial or otherwise, that a crime has been committed, and that the defendant was the perpetrator thereof, as follows: "The court on appeal 'will not attempt to determine the weight of the evidence, but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt. For it is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground' of insufficiency of the evidence, 'it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. . . .' If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury."

■ In *People* v. *Lindsey*, 90 Cal.App.2d 558, 563 [203 P.2d 572], the rule is reiterated: "Not even the appellate court's conviction of an appellant's innocence will outweigh the determination by the trial court, which is the constitutional arbiter of the facts. (*People* v. *Pruitt*, 55 Cal.App.2d 272, 275 [130 P.2d 767].) Its judgment will not be set aside unless the record clearly shows that upon no hypothesis is there sufficient substantial evidence to prove the crime charged. (*People* v. *Lindley*, 26 Cal.2d 780, 791 [161 P.2d 227].)" See also *People* v. *Perkins*, 8 Cal.2d 502 [66 P.2d 631]; *People* v. *Daugherty*, 40 Cal.2d 876 [256 P.2d 911].

The cases cited by appellant, particularly *People* v. *Elmore*, 167 Cal. 205 [138 P. 989], *People* v. *Lamson*, 1 Cal.2d 648 [36 P.2d 361], and *People* v. *Staples*, 149 Cal. 405 [86 P.

886], insofar as they are authority that an appellate court can reverse a conviction if there exists a reasonable doubt as to the defendant's guilt, no longer represent the law. The Lamson and Staples cases were expressly disapproved in *People* v. *Newland, supra.*

The judgment and the order denying a new trial are affirmed.

Van Dyke, P. J., and Peek, J., concurred.