[Crim. No. 5523.    Second Dist., Div. Two.    June 15, 1956.]

THE PEOPLE, Respondent, v. FRED J. ALLEN et al., Appellants.

Charles B. Taylor and Morris Lavine for Appellants.

Edmund G. Brown, Attorney General, and Rudolph Pacht, Deputy Attorney General, for Respondent.

MOORE, P. J.—Appellants were convicted of criminal conspiracy in violation of section 182 of the Penal Code (Count I) and for forgery of fictitious names, (Counts II through V) in violation of section 470. The conspiracy was with Titus, Tyhurst and Ogan to print, forge and pass forged checks. The remaining counts charged appellants with forgery of fictitious names by making, passing and uttering and with aiding and abetting in the making, uttering and passing of specific fictitious checks, each in the sum of $92.73 on November 26, 1954, with intent to defraud specified persons.

They base their appeal on the alleged insufficiency of the evidence, admission of allegedly illegal evidence; conviction on the uncorroborated testimony of accomplices; illegal instructions with reference to the testimony of accomplices.

### EVIDENCE SUFFICIENT

In November 1954 appellant Meyer worked with Robert Titus for the same firm. Meyer was the credit manager; Titus was the collector. In September, Titus told Meyer that he, Titus, was "broke" and must supplement his income. They discussed the possibility of uttering some fictitious checks. Meyer considered the matter and told Titus it was possible for the latter to acquire the checks needed and that some of Meyer's acquaintances were engaged in that line

of business. Such and similar conversations became frequent thereafter until November 26, 1954. After they had agreed upon the possible success of the wayward enterprise, Meyer promised to get the checks. Allen, an associate of Meyer, joined in their conversations in late October, after which they agreed upon where and how to get the required paper, who would type the checks, who would cash them and how they should divide their sinfully gained wealth. Meyer and Titus discussed the appearance of the checks, the houses against which they should be drawn and agreed to have between 80 and 100 cashed in specified areas. Meyer told Titus ''he had a printer who could print these checks up so they would be very good.'' Also, he told Titus that whomever the latter chose to cash the checks should have 50 per cent of the collections and that Meyer should keep the other half of such proceeds out of which the costs incurred for printing and paper should be paid. Titus then told Meyer he would induce his friend Tyhurst who was penniless and unemployed, to pass the checks. But Meyer required of him that any person selected should be so well known to Titus that the latter would know that such person would keep his mouth shut, not know much about their scheme and would follow orders. As further inducement, Meyer assured Titus that if the latter should be arrested, he and Allen would post bail and retain a lawyer for his defense.

Pursuant to instructions, Titus, about November 1 conferred with Allen about the details for carrying out the plans and how to pass the checks. They discussed the methods and the localities for cashing the checks and the types of stores to be victimized. By this time the printer had the checks ready to go. Titus had introduced Tyhurst to Meyer and had talked with both of them about the plan, but Tyhurst witnessed no conversation between Allen and Titus until the checks were in a condition for use.

About the time the checks were ready, Lew Ogan was employed by a phototypography company. He had done some work for Allen. When Meyer asked him to print some payroll checks, he refused. Such request was repeated in a number of conversations during which Meyer told Ogan ''he was desperate for money and this was one way to make money.'' Finally, after Ogan's share of the fruits of their crimes had been agreed to, Ogan promised to order the paper and print the checks.

On November 23, 1954, Ogan, pretending to be Don George, ordered 50 sheets of the selected paper for $2.00. He telephoned Meyer that the paper could be got at the Kelly Paper Company, and Meyer told Titus to remind Allen to pick up the paper to be used for printing the checks. Titus followed his instructions and he was told by Allen that he had called the order in and it was ready. Allen gave Titus some money and a memorandum containing only ''Don George'' and ''Kelly Paper Company.''

Titus called for the paper, found it wrapped in wrapping paper with a sample on the outside which appeared similar to that on which some of the forged checks were printed. Titus took the paper to Allen's office which the latter operated under the name *National Business Counsellors* on Melrose Avenue about 10 days before the checks were made ready for use. Allen told Titus he would send the paper out to be printed and that Titus would be advised when the checks were ready but to keep in touch with Meyer. On an afternoon in late November, Allen admitted that Titus had brought him a package and that Ogan had called for it about Thanksgiving day.

Ogan took the paper to his shop; printed four checks on each sheet, used the names of companies selected by Meyer at random from the telephone directory. Titus telephoned Meyer that the ink was still wet on the checks and that the passing of them would have to be postponed until the day after Thanksgiving. But when that day arrived Meyer telephoned Titus the checks were ready and that Tyhurst and Titus should report to Allen's office. This they did.

On their arrival, Allen was already there. He had telephoned Titus and Tyhurst that Lew Ogan was the printer and was on his way with the checks. The latter soon arrived with the checks in uncut sheets. Also, he brought a paper cutter with him. He found Allen, Titus and Tyhurst there with the package of checks and a paper cutter. The sheets of check forms were on paper similar in color to that Titus had chosen at Kelly Paper Company. They were drawn on four different companies of Los Angeles and were in different colors which were similar to those of the checks in evidence. (Exhibits 4, 5, 6, 7.) The check forms purported to be those of the purported makers thereof. The printing on the check forms was similar to that on Exhibits 1, 2, 4, 5,

6, 7 and 13,[1] but there was neither typewriting, hand writing nor check protector impressions on them.

Allen had Tyhurst and Titus take the check forms, paper cutters and typewriter downstairs where they cut and typed the checks. Allen identified Exhibit 10 as his typewriter which had been in his own office in the very month the checks were written. He gave Titus and Tyhurst his key to the downstairs room where they were joined by Ogan as they cut and typed the checks and inserted the amounts on them. Allen identified Exhibit 9 as his check protector.

The checks were signed principally by Titus and Tyhurst. Each affixed the name ''R. A. Morris'' as maker of the checks. Titus typed the amount, $92.73 and a variety of fictitious names of the payees. Allen had Titus insert ''Phil L. Bonardi'' as payee in some 25 of the checks and at the same time presented a driver's license issued to that name. Also, Allen designated which checks were to have ''Bonardi'' as payee for he had a party who would cash them in Pasadena. At the same time, Allen gave them other drivers' licenses and other identification devices for ''Robert S. Gordon'' and ''Richard Williams.'' One such device was a ''payroll record and tax statement'' showing a payment to Richard A. Williams in the sum of $92.73. It was not prepared by anyone of the confederates present. Three checks prepared on the occasion last related were received in evidence as Exhibits 1 and 7 and 13. Meyer entered the room and engaged in a conference with Allen and Titus on the matter of the disposition of the money Titus would receive from passing the checks. Before they dispersed, Meyer and Allen returned the paper cutter to Ogan.

---

[1]Exhibit 1, check purportedly given by LaBrea Plumbing Service to ''Robert S. Gordon,'' dated November 26, 1954, sum of $92.73 passed at May Company by Titus. Count II.

Exhibit 2, check passed at Hollywood Ranch Market by Tyhurst, referred to in Count III.

[Exhibit 3, photograph taken of Tyhurst at Hollywood Ranch Market at time he passed Exhibit 2.]

Exhibit 4, purported payroll check of ''Elite Glass & Paint Co.'' to ''Phil L. Bonardi,'' cashed at Hotel Green, Pasadena. Count IV.

Exhibit 5, check passed at Hattie's Bar in Pasadena, Count V.

Exhibit 6, purported ''Ames Harris Neville Co.'' payroll check to ''Robert S. Gordon'' dated November 26, 1954, for $92.73.

Exhibit 7, purported ''Pacific Iron Products'' payroll check.

Exhibit 13, includes 69 checks payable either to ''Robert S. Gordon'' or ''Richard A. Williams'' on November 26 for $92.73 each, all signed with ''R. A. Morris'' but in different penmanships.

## CASHING THE CHECKS

Booted and spurred for the consummation of the crimes, Titus and Tyhurst left Allen's office with 80 beautiful checks that in color and design might have reflected credit upon the Standard Oil Company. They purported to have been issued by the firms whose names appeared as makers on Exhibits 1, 2, 4 and 5. Titus presented Exhibit 1 to May Company's Crenshaw, identified himself as "Robert S. Gordon" and collected $92.73. About midnight of the same day, Tyhurst cashed a check, Exhibit 2, at the Hollywood Ranch Market after he identified himself as "Richard A. Williams" by use of a driver's license for that name.

On the following day, Titus and Tyhurst moved in on the peaceful community of Westchester. After an unsuccessful attempt at the store of X, they entered the store of Y. Thereupon, the manager of X, having become suspicious, followed them into Y at the moment Titus was negotiating to cash a check. Tyhurst, wary and alarmed, entered Y and observed to his companion that "something is definitely amiss." Both thereupon took flight. As an alert officer attempted to apprehend the two, Titus made his escape, but Tyhurst was caught after he had cast some checks and money into a trash can. But he still had one check, Exhibit 4, at the time of his arrest. He had taken Exhibit 14 from Allen's office as he and Titus left on their brief criminal career.

Although thwarted, the law was not long delayed in bringing the authors of that conspiracy to an accounting. Titus drove from Westchester into Baldwin Hills, buried a check, Exhibit 13, under a piece of asphalt, reached his home, changed his apparel, returned to Allen's office, and reported their encounter with the officers. Allen directed him to hide out and get rid of the typewriter. Titus gave Allen the $91 he had and reported how Tyhurst had put his money and checks into an ash can behind a store. He hid the typewriter on a vacant lot about three miles distant.

During the ensuing days, Titus talked telephonically with Meyer and Allen to whom he had reported exactly what had happened at the Westchester store and he testified to the same facts in court. When he reported it to Allen, the latter promised he would attempt to get Tyhurst out of jail. Impatient at the promised attempt, Titus called at Tyhurst's home, visited with his own family, inquired whether Ty-

hurst's mother had heard from her son. Plainclothed detectives thereupon took Titus away for further questioning.

They searched his office and seized six pieces of paper with pencil writing on them. Such writing was the repeated "signatures" of names the men had used on their fictitious checks and had been written within the two weeks preceding Titus' visit to May's Crenshaw.

### Titus Confesses

Two days after the search of Titus' office, the detectives returned and took him away to jail. There he told the officers of all that had transpired between appellants and himself and gave them his signed written statement. Also, with the officer he visited the scene of the hidden typewriter and buried check and the places where Tyhurst had cashed checks. The officers took into custody all objects used during the conspiracy and in passing the checks. Titus identified Exhibit 10 as probably the typewriter used in typing the amounts on the checks and the names of the fictitious payees and as the machine he had removed from Allen's office and thrown over the fence.

### Was There Illegal Search and Seizure?

Appellants contend also that Exhibits 9, 10, 11, 12-A, 12-B, 12-C, 14 and 23 were evidence seized as a result of an unreasonable search and seizure in violation of the 4th Amendment to the federal Constitution and of Article I, section 19 of the California Constitution. Their argument is that prior to Allen's arrest, the police had called at his office and seized the check protector (Ex. 9) and a payroll record slip (Ex. 11) and took them away. The circumstances of the seizing of those exhibits were testified to by witnesses for the People, which testimony was adopted in preference to that of defense witnesses.

After the officers had taken Meyer into custody December 16, 1954, they arrived at Allen's office about 10 a. m. Officers Anderson and Wallace went upstairs. Mrs. Mollot, the "legal" secretary, met them in the reception room. After some conversation, Mrs. Mollot had Mrs. Allen join her in a conference with the men. Mrs. Mollot told the officers that Mr. Allen was not in, one officer asked to see the place. They told her they had no search warrant, but that they were policemen. "We don't need it." They brushed Mrs. Mollet aside, and entered Mr. Allen's personal office at the rear.

Both ladies followed the officers into Allen's office and

remained more than an hour.   Officer Wallace without express permission took the check protector from the cabinet.   Allen had not specifically authorized anyone to release the device to the officers.   Mrs. Allen and Mrs. Mollot both identified Exhibit 9 as similar to the check protector removed from Allen's office.   The detectives removed also from Allen's desk, without permission, a pad of payroll record slips on which they had Mrs. Mollot place her autograph.   (Ex. 11.) Allen had never specifically given consent to its removal. The officers did not ask permission to remove anything from Allen's office, but when Allen's attorney arrived 45 minutes after the officers had entered, he approved of Mrs. Mollot's signing the payroll slip after she had done so.   Also, while the lawyer was present, a specimen of the impression of the typewriter was taken without objection.   The lawyer did not protest when the officers departed with the specimen, the check protector and the payroll slip.

Mrs. Mollot identified Exhibit 10 as the typewriter that had been in Allen's office.

While the officers were upstairs with Mrs. Allen and the lawyer, Allen was himself seated in an automobile, back of the building in the custody of an officer.   His wife saw him there, but she testified that before he arrived, the officers had removed the check protector.

Allen had been arrested about five miles from his office at 10:30 a. m.   He did not recognize the typewriter in the police car, but after his release, he discovered that one of his typewriters was missing.

The officers gave a slightly different version of their meeting with Mrs. Mollot and Mrs. Allen.   Anderson denied that anything was said about a search warrant; he said he did not need a warrant for Allen yet; a search warrant was not mentioned.   Anderson and Mollot together went into Allen's office, looked around and walked out.   Wallace listened in on a telephone call and heard a woman warn a man: ''The police are looking for you.''   At the second ring, a male voice said the police were in his office but he was at the barber shop.

Officer Smith testified that while Wallace and Anderson were inside Allen's office, he sat in a police car with Meyer and Whiteaker; that as Wallace came out he gave Smith a telephone number for the latter to get its address.   Thereupon Smith and Wallace called at the barbershop and arrested

Allen and had him inspect the typewriter in Smith's car. They drove to a point a short distance from Allen's office. Leaving Allen with Smith, Wallace approached the office where he met Allen's attorney with Anderson who [when Wallace informed Anderson that Allen was in custody, Anderson] told him to bring Allen upstairs where he wished to get the check protector and other items. When Wallace asked Allen to accompany him upstairs to get the check protector, Allen said he was suffering from an injured back and preferred not to climb the stairs. When informed that his attorney was upstairs, he said that is okay; that he cared nothing about the check protector. "It won't do you any good."

On his return to Allen's office, Wallace found Attorney Duffy, Mrs. Mollot, and Officer Anderson searching Allen's desk for a withholding form Anderson had requested. Upon their discovery of a pad of such forms, Mrs. Mollot signed one (Ex. 11) with Duffy's approval.

After Allen had remained in the police automobile for about 20 minutes, he accompanied the officers to the front. Smith took the exemplar from the typewriter on Allen's desk, wrote the serial number of the machine on a scrap of paper and Mrs. Mollot signed it. She supposed that the parts of the typewriter were in Allen's desk. Only he had the key. Smith asked Allen for the key to his desk and asked him to return with him to his office to do a little checking. Allen declined with the excuse that he had been in an accident and was sore and bruised; did not care to face his employees; Smith might go ahead and look; he would find nothing; he could do what he wished and gave Smith the key to his desk.

Allen's denial of such conversation was rejected by the jury.

Nothing was found in the desk. During the entire search and removal of things from the office, Allen's attorney was present but made no protest. Wallace and Allen entered Smith's car but inside, Smith, Anderson and Whiteaker searched the downstairs room where the checks had been prepared and brought forth the check protector and typewriter exemplar. Then they departed with appellants for the jail.

Allen denied having seen the check protector at any time from his arrest to his arrival at the Venice station, but he

never told Smith or any officer to refrain from taking anything.

It was stipulated that prior to December 16, 1954, the officers had reasonable cause to believe that Allen had committed a felony, forgery of fictitious name, and that prior to December 16, 1954, they had time within which to obtain a search warrant.

## OTHER EVIDENCE

### TITUS

Titus identified the check protector (Ex. 9) as the instrument used in preparing the checks. He identified the batch of checks (Ex. 13) as those he had hidden in the Baldwin Hills.

Allen kept a checking account at the Bank of America in the name of his "National Business Counsellors." Three of his checks (Ex. 12) were signed by him and debited to such account on November 29, 1954. An expert testified that the same check protector used on them was used also on Exhibits 1, 2, 4, 5, 6, 7 and other checks. An expert on questioned documents identified the exemplar from the typewriter (Ex. 10) as having been written on the same machine that produced Exhibits 1, 2, 5, 6 and 7.

### OGAN

In the presence of Meyer, Titus and Tyhurst and the other officers, Smith elicited certain statements from Ogan on December 16, 1954, and testified substantially as follows:

Ogan said Meyer asked him whether he would print some checks for him, but he refused. Again Meyer asked him to print the checks. Finally, he agreed to do so. He said Meyer wanted one hundred checks on four companies; he would receive $50 when he made the checks and if they were passed, he would get more. He said he telephoned a paper company under a fictitious name and ordered the paper; telephoned Meyer where the paper could be had; later, Allen telephoned him and he called on Allen and got the paper and instruction to fix them up; he took the package back to his place; scanned the yellow pages and picked four firms to use on the checks; after he had printed them but before they were cut, Allen telephoned to know whether they were ready; he told Allen they were in sheets of four and that Allen would have to cut them; Allen asked him to bring his paper cutter and the checks to Allen's office; on arriving there he met Titus and

Tyhurst, both strangers then; Allen told Titus to take the check protector, the typewriter and the checks to a basement office and fix them up; he accompanied the men to the basement and showed them how to operate the cutter as well as to clear the check protector of the plate that stamped "National Business Counsellors" and to insert in its stead "The sum of"; he returned to his work and later Meyer telephoned him that Titus and Tyhurst had been arrested.

### MEYER INTERVIEWED

Further, Smith continued, Meyer said that Ogan's statement was true wherever he, Meyer, was mentioned; Meyer said he did not know whether the idea of having the checks printed was his own or that of Titus; the latter had come to him saying that he needed money and in a few days one or the other suggested passing these checks; he did not recall telling Ogan to print any particular company on them; he was at Allen's office November 26 and saw Titus and Tyhurst working at something with a typewriter; he did not see what they were doing; he didn't wish to see; he contacted Ogan to print the checks, but did not remember how many checks he asked him to print; he did not remember what had been promised Ogan for printing the checks; that he had made several telephonic calls in reference to the checks; he had first been approached by Titus about passing the checks, had at first declined the proposal in early November, but later he told Titus he had known a party that might be available, and he contacted Ogan.

### MEYER'S TESTIMONY

Meyer testified that he told Ogan a friend desired to pass some checks and wished to have Ogan make them for him; that Ogan declined the job; did not wish to get involved in such a scheme. Also, he testified that after his talk with Ogan, he had a conversation with Titus and that the latter had telephoned him to make another attempt; that he did so and again Ogan rejected the offer saying he would have nothing to do with it; that he had in several conversations asked Ogan to print the checks and had told the officers at the Venice Station that Ogan had notified him that the paper was ready; that he had told the officers he was present while Titus and Tyhurst were typing in Allen's basement office November 26, 1954; that the only part he had played was his arrangement with Ogan to print the checks.

Prior to the trial, Titus and Tyhurst had pleaded guilty to one count of forgery of fictitious name and been placed on probation for five years.

## No Illegal Search or Seizure

Appellants contend that they were prejudiced by the admission of documents and other items of personal property taken from their possession by an illegal search.[2]   There was neither illegal search of any defendant nor illegal seizure of any of the items with the lone exception of Exhibit 14.   It was taken from Tyhurst's person while in flight from the policeman at Westchester.   At that time the officer did not have knowledge of the crime or that Tyhurst was involved in a felony.   The payroll record was obviously admitted through inadvertence. However, neither appellant bases his argument upon that exhibit.

As to all other exhibits, they were taken in searches incidental to the arrests. At the time of the search of Tyhurst and Titus, they were in the act of committing a felony and when Allen's office was searched and the items seized, the officers had good reason to believe that he was equally guilty. But for all that, it was stipulated that prior to December 16, 1954 "the officers had reasonable cause to believe that Allen had committed a felony." (See *supra.*)   ▇   Therefore, the arrests were lawful and the searches and seizures, being incidental thereto, were legal.   (*In re Dixon,* 41 Cal.2d 756, 761 [264 P.2d 513]; *Agnello* v. *United States,* 269 U.S. 20 [46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409].)

Exhibits 9 and 11 were not illegally removed.   Both were taken after Allen's codefendants had disclosed the entire scheme to the officers and the latter knew sufficient of the facts to warrant Allen's arrest.   In fact, he was under arrest at the time his office was searched and those items were seized.   Also, Mrs. Mollot testified that Allen's attorney advised her to sign her name on Exhibit 11.   The contradiction of the People's witnesses on the incidents of the arrests and the searches is no longer of any value, the trial court having

[2]The Exhibits objected to were:
 9.   The check protector.
 11.   The Ideal Payroll Record and Tax Statement form taken from National Business Counsellors.
 12.   The three National Business Counsellors' checks.
 14.   The Ideal Payroll Record and Tax Statement made out for "Richard A. Williams" indicating a payment of $92.73, and taken from Tyhurst's possession at the time of his apprehension.

resolved such contradictions against appellants. The implied finding that Exhibits 9 and 11 were seized after Allen's arrest is binding on appeal. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778] ; *People* v. *Frankfort,* 114 Cal.App.2d 680, 701 [251 P.2d 401].) The contention that the admission of Exhibits 9 and 11 was error because they were taken in Allen's absence is without merit. Neither was it unreasonable to remove such exhibits without a search warrant. Merely because the officers could have obtained a search warrant does not render illegal their seizure without one. ▮ Even though officers have time to procure a search warrant to search the person or premises of a suspect, if his arrest is justifiable, a search of his premises and his person is reasonable as incidental to a lawful arrest. (*United States* v. *Rabinowitz,* 339 U. S. 56 [70 S.Ct. 430, 94 L.Ed. 653] ; *Trupiano* v. *United States,* 334 U. S. 699 [68 S.Ct. 1229, 92 L.Ed. 1663].) ▮ The Fourth Amendment does not forbid all searches, but only unreasonable searches. The authors of the Bill of Rights did not suggest or imply that when law enforcing agencies have learned that a person has committed a felony, they must await the convenience of the offender before moving into his lair. They were wrestling with the problems that had arisen from the arbitrary searches by the minions of an arbitrary despot. They had not conceived of the difficulties to be encountered by a generous government in dealing with arbitrary criminals in a complex society with countless avenues whereby to secrete the evidences of their crimes. But clearly they did reckon upon the apprehension of criminals and did not aim to inhibit prompt, reasonable searches to the end that after the robber has been arrested the officer might without a search warrant make a search as an incident of the arrest. (*United States* v. *Rabinowitz, supra,* p. 64.) While the court condemned "general, exploratory searches," it did not suggest as violative of the constitution a reasonable search for specific evidence at the locale of the crime.

In the case at bar, the officers knew that a series of vicious crimes had been undertaken. While they had the confessions of some accomplices, in order to gain convictions they knew that concrete evidence would be essential to a satisfactory corroboration. They knew the check protector and the payroll record and tax statement such as they had found on Tyhurst would advance the cause of justice.

██ The claim that Exhibits 9 and 11 were seized without Allen's consent is to ignore the implied finding that the officers knew that Allen had consented to the removal of both exhibits. (See *People* v. *Gorg*, 45 Cal.2d 776, 783 [291 P.2d 469].) He himself practically consented to the removal[3] of the check protector (Ex. 9) and his secretary inscribed her name on the Ideal Payroll (Ex. 11) as the officers took it away. All conflicts in the evidence with reference to Allen's consent to the seizure having been resolved by the trial court, it is final here. (*Dillard* v. *McKnight*, 34 Cal.2d 209, 223 [208 P.2d 387, 11 A.L.R.2d 835].) ██ No seizure for which consent has been given can be unreasonable. (*People* v. *Michael*, 45 Cal.2d 751, 753 [290 P.2d 852].) ██ Whether a search or seizure was legal is a question of law to be determined by the trial court in the first instance. ██ The only way to obviate such determination is to show that there was no substantial evidence in support of it. (See *People* v. *Newland, supra,* 15 Cal.2d 678, 681; *People* v. *Camargo*, 130 Cal.App.2d 543, 549 [279 P.2d 194].)

The contention that the search was illegal has no basis in fact. Even though the officers might have entered his office in his absence, they took nothing away until after his arrest and his consent to the removal of the exhibits in question. If the officers inspected and stood by to prevent a spoliation of evidence, the search was ratified by him and was therefore legal. (See *People* v. *Winston*, 46 Cal.2d 151, 162 [293 P.2d 40].)

THREE CHECKS TAKEN FROM THE BANK

It is not true that the three checks (Ex. 12) were obtained by an illegal search. They were obtained from the bank on which they had been drawn by Allen for the payment from his funds of the amounts specified.

The typewriter Titus hid behind the fence was recovered by the officers and was received in evidence as Exhibit 10. The expert witness Sloan, identified it as the typewriter he had used in writing an exemplar (Ex. 23) at the police crime laboratory. Such testimony was sufficient foundation for the introduction of both exhibits. ██ A reviewing court accepts the implied finding of the trial court with reference to the veracity and truth of a witness who has testified concerning

---

[3]When Anderson told Smith to bring Allen upstairs, attempt at compliance was frustrated by Allen who said, "I don't want to go upstairs; whatever happens is OK." Also, he gave his desk key to the officers.

the authenticity of a questioned document or to the identity of the machine on which the document was written. The witness had no doubt that exhibit 10 was used in writing the four checks. No error in receiving in evidence either of such exhibits. Exhibits 10 was an important item in that after Tyhurst's capture, Allen told Titus to destroy it and the latter led the officers to recover it.

### ACCOMPLICES CORROBORATED

There was sufficient corroboration of the confederates who testified against appellants. Allen corroborated Titus and Ogan by his admission that Titus brought a package to him at his office the very day he had conversed with them about it. It was proved by the expert witnesses that Exhibit 23 had been prepared on Allen's typewriter and the check protector was used in preparing the forged checks. Also, Allen testified that the check protector (Ex. 9) and the typewriter (Ex. 10) were his own and were in his office in November 1954. That corroborated the testimony of Ogan and Titus to the effect that Allen told Titus, Tyhursti and Ogan when Ogan came to Allen's office to take (1) the check forms Ogan had printed on safety check paper, (2) the paper cutter, (3) the typewriter and (4) the check protector from Allen's to a downstairs office to begin the preparation of the checks.

Tyhurst testified that the "Ideal Payroll Record and Tax Statement" (Ex. 14) was given to him by Titus at Allen's office, November 26. A duplicate (Ex. 11) of Exhibit 14 was taken from a pad of such forms in Allen's desk. Also, Mrs. Mollot testified that only Allen had its key. Those items of testimony corroborate the testimony that Allen participated in the conspiracy.

Titus testified that he hid the typewriter on Allen's instructions. It was stipulated that the check protector (Ex. 9) was sent out of Allen's office November 30, 1954, the day of Titus' arrest, and that it remained away for several days. The stipulation tended to corroborate the testimony of Titus that it was on Allen's instructions that he hid the typewriter.

Ogan had testified to conversations he and Meyer had concerning the printing of the checks. Meyer gave similar testimony and, also, testified, as did Titus, about their conversation with reference to Meyer's persuading Ogan to print the checks. After Meyer had admitted to Officer Smith that

Titus had originated the idea to pass forged checks, Smith testified to Meyer's admission.

Not only did Smith testify that Meyer admitted to him that the latter had requested Ogan to print the checks, but also that Meyer had made calls on Ogan to do the printing. That corroborated the testimony of Ogan and Titus on the same subjects.

Meyer told Smith that he, Meyer, did not recall how many checks he asked Ogan to print. Also, he told Smith he did not recall what Ogan was to be paid. That corroborated testimony of Ogan and Titus as to Meyers' conversations with reference to the same subjects.

Meyer admitted to Smith that Ogan's statements were correct insofar as they told the part Meyer had played in the conspiracy; also that he had agreed to have the checks printed. Smith's testimony of such admissions corroborated testimony of Ogan and Titus. Also, Meyer admitted to Ogan that the latter notified him that the paper was ready and that he was at Allen's office November 26, 1954, and saw Titus and Tyhurst preparing the checks in the basement.

Such testimony fully meets the requirements of section 1111 of the Penal Code. Standing alone, it does not with exactness establish the facts as testified by accomplices, but it tends to connect appellants with the conspiracy and makes them accessories to the forgeries by Titus and Tyhurst. It is, therefore, sufficient corroboration. (*People* v. *MacEwing*, 45 Cal.2d 218, 224 [288 P.2d 257]; *People* v. *Santo*, 43 Cal.2d 319, 327 [273 P.2d 249]; *People* v. *Simpson*, 43 Cal.2d 553, 563 [275 P.2d 31]; *People* v. *Perry*, 123 Cal.App.2d 74, 80 [266 P.2d 515]; *People* v. *Califro*, 120 Cal.App.2d 504, 514 [261 P.2d 332].) ■ Corroborating evidence is not required to support every fact testified to by the accomplice. It has served its purpose if it merely connects the defendant with the commission of the crime (*People* v. *Gallardo*, 41 Cal. 2d 57, 62 [257 P.2d 29]; *People* v. *Simpson, supra*) and it is sufficient if its combined accumulative weight tends to connect the accomplice with the crime charged, even though no single isolated act is sufficient. (*People* v. *Trujillo*, 32 Cal.2d 105, 111 [194 P.2d 681]; *People* v. *Henderson*, 34 Cal.2d 340, 342 [209 P.2d 785]; *People* v. *Lindsey*, 90 Cal.App.2d 558, 562 [203 P.2d 572].) ■ The proof that Allen had in his office the typewriter (Ex. 10) and the check protector (Ex. 9) used in making the checks was excellent corroboration of the testimony of Titus, Tyhurst and Ogan. (*People* v.

*Keene,* 128 Cal.App.2d 520, 525 [275 P.2d 804] ; *People* v. *Morris,* 110 Cal.App.2d 469, 477 [243 P.2d 66].) In *People* v. *Flood,* 41 Cal.App. 373, 376 [182 P. 766], the accused was charged with forging checks. His accomplice testified as to the manner in which the checks had been prepared. The corroborative evidence was the typewriter used in writing the checks and that was established by comparing the checks with an exemplar taken from the machine and by proof that the defendant had possessed the typewriter at a particular time.

Inasmuch as no statute has been enacted defining what constitutes corroboration, except that it must tend to connect the defendant with the commission of the crime, the several decisions of the appellate courts have settled that the corroboration of the accomplices in this action is abundant and complies with the evident intention of the Legislature. It is neither imagination nor suspicion, but substantial.

### INSTRUCTIONS

██ The court instructed the jury at the request of appellants as follows :

"It is the law that the testimony of an accomplice ought to be viewed with distrust. This does not mean that you may arbitrarily disregard such testimony, but you should give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case."

Appellant says the instruction is erroneous in that it omits the phrase "if any" and that it implies that weight should be given to the testimony of accomplice. No such construction could reasonably be given the instruction. It did not preclude the jury from giving little weight or no weight to the accomplices' testimony. Under it the jury could accept or reject all the testimony of accomplices. ██ Appellant Meyer has no cause for complaint even if the instruction had been erroneous for he invited it. (*Saltzen* v. *Associated Oil Co.,* 198 Cal. 157, 161 [244 P. 338] ; *Bates* v. *Newman,* 121 Cal.App.2d 800, 808 [267 P.2d 197].) He who induces an error by his own proposed instruction is estopped from attacking it. (*Shapiro* v. *Equitable Life Assur. Soc.,* 76 Cal.App.2d 75, 94 [172 P.2d 725] ; *Jackson* v. *Superior Court,* 10 Cal.2d 350, 358 [74 P.2d 243, 113 A.L.R. 1422].)

The court gave the following instruction :

"The corroboration of the testimony of an accomplice required by the law is not sufficient if it merely shows the com-

mission of the offense or some or all of the circumstances thereof, or if it does no more than raise a suspicion of the guilt of the defendant. On the other hand, it is not necessary that the corroboration extend to every fact and detail covered commission of the crime].

by the testimony of the accomplice [nor need it show the

"The corroboration of the testimony of an accomplice is sufficient if, of itself alone, it tends to connect the defendant with the commission of the offense, although it may be slight and although if, standing by itself, it would be entitled to but little consideration.

▮ *"The corroborating evidence required by the law may be circumstantial as well as direct and the entire conduct of the accused himself [both as a witness in his own behalf and at times other than at the trial], as shown by the evidence, along with all other evidence in the case, may be looked to for corroborative circumstances."*

The first part is taken from California Jury Instructions Criminal (CALJIC); the italicized portion was added by the court and it is a correct statement of the law. It is not susceptible of the construction that the jury is instructed to believe that corroborative evidence was sufficient although it proved only the circumstances of the offense. It is held that Penal Code, section 1111, is correctly interpreted as stating that evidence of circumstances is sufficient corroboration of an accomplice's testimony. (*People* v. *Temple*, 102 Cal.App. 2d 270, 277 [227 P.2d 500].) ▮ Corroborating evidence may be inferences drawn from the circumstances of the crime. ▮ Any circumstantial evidence is sufficient to corroborate under section 1111 if it proves that the accused was connected with the criminal act. (*People* v. *Santo*, 43 Cal.2d 319, 327 [273 P.2d 249]; *People* v. *Berger*, 128 Cal.App.2d 509, 513 [275 P.2d 799].) ▮ Since appellants have not shown that injury to appellants resulted from the instruction, a reversal could not be ordered because of its contents. (Const., art. VI, § 4½; *People* v. *Wheeler*, 65 Cal. 77, 78 [2 P. 892]; *People* v. *Malley*, 49 Cal.App. 597, 606 [194 P. 48].)

### LIMIT ON VOIR DIRE EXAMINATION

▮ Appellant Meyer contends that the court erred in limiting the *voir dire* examination of Officer Smith who testified to certain admissions of Meyer at the Venice Police Station. Meyer's counsel then undertook to show that prior to the "confession" or admissions of Meyer, he had been

deprived of food and had not been taken before a magistrate. He now argues that he was denied the right of due process of law and that his statements to Smith were not free and voluntary. If his rights had been violated by the officer in not more speedily taking him before the magistrate, he should have sought relief through the proper channels. ▪ He cannot escape the penalties for a felony because he imagines that he was not conveyed promptly before the magistrate at the time of his apprehension. There is no claim by appellant Meyer that his admissions were forced by fear or menace or promise of reward. If made freely and voluntarily at any time after arrest, they are admissible. (19 A.L.R.2d 1332, 1336.) A voluntary admission is not a necessary product of the illegal detention. While a coerced confession gives the victim no chance to speak his own thoughts, one who voluntarily announces his own conclusions or narrates his own experience has been deprived of nothing. Therefore, if Meyer made admissions to Smith of his own free will, the exclusionary rule is not applicable. (*Rogers* v. *Superior Court*, 46 Cal.2d 3, 10 [291 P.2d 929].) When first asked by the officer whether he cared to tell about his part in the passing of the fictitious checks, he said he did not care to make a statement until he had seen his attorney. His prior with the law had acquainted him with his constitutional rights.

▪ Now, as to abbreviating the *voir dire* examination by Meyer's counsel, there was no such thing. Three questions were asked, whereupon Meyer's lawyer announced: "I have no further questions." He chose to abandon his quest; was not ordered to desist.

The judgments are affirmed.

Fox, J., and Ashburn, J., concurred.

Petitions for a rehearing were denied June 27, 1956, and appellants' petition for a hearing by the Supreme Court was denied July 11, 1956.