JERRY ZAMPELLA, BY NEXT FRIEND, APPELLANT, v. DANIEL FITZHENRY, TRADING, ETC., RESPONDENT.

Submitted March 27, 1922—Decided June 19, 1922.

1. An infant's exemption from contributory negligence can be invoked only where liability has been shown primarily to exist, as the logical sequence of the concurrent existence of a legal duty.

2. Plaintiff, a boy of fifteen years, was invited by the driver of an automobile truck, who was in the employ of the defendant, to board the truck for a ride. While standing on the running board of the truck, the latter struck a rut in the street, causing the boy to fall, causing the injury complained of. *Held*, that the invitation of the driver of the truck to the boy to ride with him was unauthorized by the owner, and was not within the scope of the driver's implied authority as a servant of the master, and no liability was therefore imposed on the owner of the truck.

On appeal from the Hudson County Circuit Court.

For the appellant, *Alexander Simpson.*

For the respondent, *Thomas H. Brown.*

The opinion of the court was delivered by

MINTURN, J. While playing upon a public street, in Jersey City, the plaintiff, a boy fifteen years of age, was invited by the driver of an automobile truck, who was in the employ of defendant, to board the truck for a ride. While occupying a position on the running board of the truck, the latter struck a rut in the street, causing the boy to fall from the truck and thereby receive the injuries which present the basis for this suit. The truck was used for general delivery purposes and at this time was engaged in transporting machinery. Other boys were occupying seats on the truck, but the plaintiff took his place upon the running board. He pictures the situation thus: "I was with a bunch of boys, and the chauffeur waved to us with his hand. Told us to come on. One

of the boys asked him if he would give us a ride down Newark avenue. We got on the front part—the running board—a lot of boys with me. About nine boys. They were on the side and on the running board. I remember I got on the truck—that is all. I don't remember how I got off." No testimony was offered by the defence, but upon motion the learned trial court granted a nonsuit upon the authority of *Karas* v. *Burns Bros.*, 94 *N. J. L.* 59.

That case, it will be observed, in its essential particulars, was not unlike the case at bar. The driver of a loaded coal wagon helped a boy of eight years to ride upon the wagon, from which he was thrown by the contact of the wagon with an obstacle in the street. In denying the liability of the owner of the wagon for the unauthorized act of the driver, the Supreme Court differentiated the application of the rule of *respondeat superior,* between those acts which are within the apparent scope of the agent's authority and those which are obviously not within such authority, but rather in manifest violation of it; and in the absence of proof from which such authority could be implied, liability of the principal was denied. An analysis of the legal rule of agency, in which the doctrine of *respondeat superior* has its origin, will serve to clarify the distinction, if not to harmonize decisions which in many instances are at variance, doubtless due entirely to the intricacies of modern social and industrial service. "Properly interpreted," says a distinguished author, "the law of agency rests upon as sound a basis of common sense, and is as much in harmony with fundamental notions of justice as any other branch of the common law." 2 *Street Lib.* 429.

The theory upon which this doctrine of vicarious responsibility is predicated is representation in a certain field of service and is based primarily upon the philosophy involved in the maxim of the Roman law: *"Qui facit per alium facit per se,"* involving manifestly the contractual conception of consent by one party and representation by the other. *Hunt. Rom. L.* 531.

The earlier English law made the master both criminally and civilly liable for the torts of the servant; but this liability was evolved from the social status created by the feudal system, which conceded to the master a species of proprietary or chattel ownership in the servant, as an incident to the freehold. 2 *Poll. & Malt. Hist. Eng. L.* 529.

"Thus," said William the Conqueror, "all who have servants are to be their pledges. If any such are accused the masters are to bring him before the hundred for trial. If, in the meantime, he flees the master shall pay the money due." *Leges Will,* 1 *Ch.* 52.

After this conception of absolute responsibility, based upon the doctrine of social status, had been eliminated by the evolution in social institutions, the next legal conception, enunciated the doctrine that the master could not be held liable for the torts of the servant, unless he had consented to the wrongful act or had actually commanded it. Prof. Wignore, 7 *Harv. L. Rev.* 384; citing year book cases, *Edw. I* 474. During the reign of Edward III we find a relaxation of this rule and its practical extension, so as to comprehend the modern legal theory of agency or representation, as a basis for liability.

Thus, Rolle, in his "Abridgement," speaking for that period of legal evolution, declares: "If the servant, by command and consent of the master, sells (goods) to a particular man, an action lies against the master if the goods be worthless." 1 *Rolles Ab.* 94. But even at that period the modern rule of representation, which then began to develop, for the positive misfeasance of the servant, in the execution of the master's instructions, the servant alone was liable.

Thus says Rede, C. J., in Y. B., 21 *Hen. VIII* 23: "Where I command my servant to take lawful distress, and he rides (the beasts) down, in this case he shall be punished and I am excused; because when I command a lawful act and the servant acts contrary to instructions, he is guilty of a tort. As I did not consent to this, it is reasonable that he should be punished instead of me."

In 1353 we find legal liability based upon the theory of agency or representation beginning to obtain general recognition; for in that period the commercial spirit, which now dominates the trend of events, was beginning to assume importance as a distinct branch of jurisprudence, from which was evolved the doctrine of principal and agent, where liability is entirely predicated upon the theory of actual or implied representation. Thus a master was held liable for the tort of a bailiff, upon the theory that the bailiff was acting "within the scope of his ostensible authority." 8 Y. B. 27, Assizes 133.

In 2 Rolles Ab. 26, dealing with the cycle of time which concluded about the year 1700, Chief Justice Popham declared, in a case involving an illegal seizure at sea, "the crew were sent upon a lawful errand, and by departing from the line of their duty, and doing an illegal act, they themselves became liable and the master was not bound."

Lord Holt, about that time assuming his position as Chief Justice of the King's Bench, indulged his legal acumen by giving practical shape to the final development of the conception of the theory of agency or representation as a basis for liability as we have it to-day.

In Tuberville v. Stampe, 7 Comb. 459, he declared in an action against the master for injuries resulting from the act of the servant: "If the defendant's servant kindled the fire in the way of husbandry, and it was proper for his employment, though he had no express command, yet the master shall be liable, for it shall be intended that the servant had authority from his master, it being for his master's benefit."

Thus, after these progressive steps in the social evolution, we have the rationale authoritively promulgated, which has furnished the rule in all subsequent English adjudications. Blackstone reiterates it in his commentaries: "If a servant by his negligence does any damage to a stranger the master shall answer for his neglect. But in these cases the damage must·be done while he is actually employed in the master's service; otherwise the servant shall answer for his own misbehavior." 1 Bl. Com. 430.

Such is now the consensus of English and American law, except where changed by statute, and from this legal conception has emanated that succinct but comprehensive mandate: "Let the master respond, or *respondeat superior.*"

Decisions might be multiplied, which in the attempt to apply a satisfactory legal rule of liability, courts have misconceived this historical rationale upon which liability is predicated. No question or criticism can result where the servant does an act wantonly or maliciously, as in *Croft v. Allison* (1821), 4 *B. & A.* 590, 6 *E. C. L.* 614, where a driver wantonly struck the horse of another, and the master was held not liable, the act being considered by Lord Kenyon entirely extraneous to the employment, and done to satisfy only the whim of the servant. "When," said Lord Kenyon, " a servant quits sight of the object for which he is employed, and without having in view his master's orders, pursues that which his own malice suggests, he no longer acts in pursuance of the authority given him."

The same principle was applied where a clerk was sent on an errand. Instead of returning as directed, he drove about on business personal to himself and ran over a child, and the master was exonerated. *McManus* v. *Crickett,* 1 *East* 106. We have applied the same principle in this court, within recent years, in *Evers* v. *Krouse,* 70 *N. J. L.* 653; *Doran* v. *Thompson,* 76 *Id.* 754; *Missell* v. *Hayes,* 86 *Id.* 348; *Jennings* v. *Okin,* 88 *Id.* 659, and *Cronecker* v. *Hall,* 92 *Id.* 450.

In *Jennings* v. *Okin, supra,* we declared: "From the moment it (the deviation) was undertaken (by the servant) the relationship of principal and agent theretofore subsisting was severed." It matters nothing in the legal equation whether the deviation which caused the damage consisted of a malicious act in nowise related to the master's business, or of an independent act peculiarly due to the whim, or the individual capriciousness of the servant in failing to attend to the business entrusted to him; the act in either event being disconnected from the master's work, and having no logical or legal relation thereto, the master upon any theory of

agency or representation is exempt from responsibility. Nor is it of consequence, as in the case at bar, that the plaintiff occupies the status of an infant; for the defendant being under no legal duty of responsibility, no right or liability can be predicated upon a non-existent duty. An infant's exemption from contributory negligence can be invoked only where liability has been shown primarily to exist, as the logical sequence of the concurrent existence of a legal duty. *Kingsley* v. *D., L. & W. R. R.,* 81 *N. J. L.* 536; *United Zinc Co.* v. *Van Britt, U. S. Sup. Ct.* (66 *L. Ed.*) 349 (advance opinions); *Smith L. Neg.* 6.

Such we conceive to be the rationale of the rule laid down by the Supreme Court in Karas *v.* Burns Bros., which was invoked by the learned trial court, as furnishing the rule of law upon which the nonsuit was granted. The reasoning contained in the opinion in that case commends itself to us as a correct exposition of the legal rule of liability in this class of cases, and the essential similitude of fact in both cases requires the affirmance of the judgment under review.

Such will be the rule.

*For affirmance* — THE CHANCELLOR, CHIEF JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, BLACK, KATZENBACH, WHITE, HEPPENHEIMER, WILLIAMS, GARDNER, ACKERSON, VAN BUSKIRK, JJ.   15.

*For reversal*—None.