[Crim. No. 3110. First Dist., Div. One. Mar. 20, 1956.]

THE PEOPLE, Respondent, v. MARIO JULIUS MARTINA, Appellant.

Joseph C. Haughey and Toland C. McGettigan for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and William M. Bennett, Deputy Attorney General, for Respondent.

BRAY, J.—Defendant appeals from a jury verdict judgment of conviction of murder in the second degree and from an order denying new trial.

## QUESTIONS PRESENTED

1. Sufficiency of the evidence (a) that death was due to criminal means; (b) that defendant was the assailant.

2. Defendant acted while unconscious (a) as a matter of law; (b) instructions.

3. Alleged misconduct of district attorney.

4. Instructions and district attorney's comment on first degree murder.

## EVIDENCE

(a) *Means of Death.*

In the early afternoon of Wednesday, September 1, 1954, a chambermaid opened hotel room Number 301 and found therein lying on the bed the partly unclothed body of 75-year-old Florence Hopkins. Both her eyes were blacked and swollen shut. There was blood about her face. She was lying on her back upon her dress with her blouse and slip pulled back and torn. Her brassiere was unhooked, exposing her chest. Red matter, which a police inspector believed to be blood, was found on and about the bed, on the wall above the bed and on a pillow found on the floor. Mrs. Weir occupied the room adjoining Number 301. Between 2 and 4 a.m. September 1st she was awakened by the scream of a woman in that room. She then heard three or four bumpings which sounded like somebody had been hit. Between each bumping she heard a woman's voice saying, "You hurt me so." A man's voice said "Keep quiet," the utterances being a couple of minutes apart. The witness heard rather loud sobbing or crying during the entire time. The noise gradually got lighter and finally stopped.

The surgeon who performed the autopsy found a large bruised area over the left forehead extending from the hair line well down onto the cheek, bruises about both eyes, laceration of the right lower eyelid about an inch long; fracture of

the nasal bone, puffing and bruising of both lips; area of hemorrhage in the upper chest muscles, "bloodstaining of the trachea, larynx and bronchi, . . . with some mucoid matter and blood within their lumens . . . marked edema of the lungs." All injuries he considered to be of recent origin. In his opinion the injuries were caused by external force or violence. "It is even likely" that human fists caused the injuries, and if so, it would have taken at least six blows. Death was caused by filling of the lung with blood from the nose.

A pathologist who worked on the tissues and organs of the deceased found certain abnormalities, pinpoint hemorrhages in the brain, a hemorrhage between the brain covering and the brain itself, a large amount of bloodstained mucous material in the windpipes and air passages in the neck and lung. He attributed these conditions to direct physical violence or blows. He stated that there must have been severe physical violence to the chest (like being hit by an automobile or falling from a building) and not an ordinary mild injury. He attributed death to "a loss or a decrease in the ability of the body to get oxygen into the blood." The injuries mentioned all played a part, no one by itself producing the whole picture. The blood alcohol level indicated a moderate degree of intoxication. This made the victim more vulnerable to death of this type.

Defendant's contention that the evidence was not sufficient to establish death by criminal means is based mainly upon the following, the absence of external bruising of the chest and head area (other than around the eyes, nose and lips), the testimony of the surgeon and the pathologist that each of the conditions he found possibly could have been due to a fall,* the fact that a witness who saw defendant and deceased together in a bar about 10 p. m. saw deceased bump into the side of a booth and fall into the seat, and that there was no evidence of choking or damage to the neck nor of any sexual abuse or intercourse. All of these were matters for the jury. Coupling the conditions found by the medical men, particularly that in their opinion these conditions could have been caused by blows, with the testimony of Mrs. Weir and the conditions in the room, plus the entire evidence in the case, it is obvious that there was sufficient evidence to support

---

*Defendant ignores the surgeon's testimony that it was unlikely that all conditions could have occurred in a single fall.

its implied finding that deceased met death by criminal means.

(b) *Defendant was the assailant.*

A witness testified to seeing defendant and deceased about 10 p. m. Tuesday night seated and drinking beer together in a bar across the street from the hotel. They left the bar together about 12 or 12:30 a. m. There were then no marks or blood on deceased's face. Deceased staggered when leaving. The witness Shoup was the night clerk at the hotel. About 12:30 a. m. September 1st, defendant registered, signing "M. J. Martine, 3613 S. Ord, Eugene, Oregon." Shoup asked if his registration included a wife and when informed that it did, the clerk added "& Mrs." on the register. Defendant paid for the room, took the key and went up in the elevator. About five minutes later, defendant left the hotel, stating that he had to see if he could get his truck unloaded. About 1:15 or 1:20 defendant returned and stopped at the desk. When asked if he had brought his wife in yet, he replied, " 'No, we are coming in,' what they call 'piecemeal.' " Defendant left. About 1:30 the witness saw defendant and a woman standing in front of the elevator. Her back was towards the witness. She wore a red colored coat and "her legs were kind of shaking a little bit; not too much, but some." At 2:40 as the witness was checking the floors, he saw defendant coming down the stairs between the third and second floors. The witness asked defendant why he was not using the elevator and he replied, "No, I'll walk." The witness took the elevator to the lobby and again met defendant as the latter was going out the door. Defendant stated, "Well, I have got to wake up somebody now." Defendant appeared to be sober.

Inspector Murray testified that after defendant's arrest he took defendant to the bar and the hotel but that defendant insisted he could not recall anything from Tuesday afternoon until Wednesday morning. In defendant's clothing was found a paper written by defendant on September 1st which appears to be a will. The inspector found no blood on any of the furniture in the room except the bed. None of the furniture was overturned. No fingerprints were found except a "smudge" on the faucet in the wash basin. It was of no value for identification purposes.

Defendant neither testified nor offered any evidence. The day after the killing defendant made a statement to the assist-

ant district attorney which was taken down in shorthand and was read to the jury. Among other matters he stated that on Tuesday he went down to the employment office where he picked up and cashed a $21 unemployment check. He gave his wife $16 of it. From 1 o'clock Tuesday until late Wednesday evening he could not remember what happened or even if he left home. The scratches on his neck and upper lip were the result of shaving and the black and blue bruises on his knuckles resulted from bumps received at work. He smoked Tareyton cigarettes (a partially used package of them was in his possession when arrested) and a pipe and had recently used Dill's tobacco but could not tell what date. He denied using pipe cleaners recently but had used them in the past. (In room Number 301 a package of Dill's pipe cleaners and a crumpled Tareyton cigarette were found.) To all questions concerning his connection with the crime, he answered similarly to "I don't deny it, sir, because I don't know."

It is obvious from the foregoing statement of the evidence that while entirely circumstantial it clearly shows the defendant to have been the assailant responsible for the death of the deceased. Especially is this so, when one considers that it is equally obvious that the jury did not believe defendant's unsworn statements that he had "blacked out." ▮ ". . . circumstantial evidence is as adequate to convict as direct evidence." (*People* v. *Koenig*, 29 Cal.2d 87, 91 [173 P.2d 1].) The fact that there appeared to be a lack of motive for the crime was a matter for the jury to consider and did not overcome the other evidences of defendant's guilt.

### UNCONSCIOUSNESS

*(a) As a matter of law.*

Defendant places great emphasis upon his unsworn statement that he had blacked out. He also had stated that he had previously suffered a head injury and on a prior occasion had also blacked out, and contends that as these statements were introduced by the plaintiff, such statements conclusively establish that if defendant committed the crime he did it while he was not conscious of his acts. ▮ In the first place, the mere statements "I don't remember," or "I can't recall" are not sufficient to establish unconsciousness at the time of the commission of a particular act. ▮ But assuming that they were, the rule is not that statements of a defendant introduced by the prosecution are completely binding on the prosecution and fully establish their truth. They

are binding on the prosecution and establish their truth only in the absence of proof to the contrary (*People* v. *Toledo*, 85 Cal.App.2d 577, 581 [193 P.2d 953]; see also *People* v. *Coppla*, 100 Cal.App.2d 766, 769 [224 P.2d 828]; *People* v. *Marks*, 111 Cal.App.2d 357, 359 [244 P.2d 771]) and such statements may be contradicted by circumstantial evidence alone (*People* v. *Shellenberger*, 25 Cal.App.2d 402 [77 P.2d 506]). ▮ Even testimony of a defendant under oath as to lack of consciousness may be overcome by circumstantial evidence. (*People* v. *Rayol*, 65 Cal.App.2d 462 [150 P.2d 812].) Here from the circumstances of the case the jury could (and undoubtedly did) conclude that defendant's actions were normal actions and that defendant was conscious of his acts.

*(b) Instructions.*

Defendant complains of the refusal of the court to give his proposed instructions 56,. 57 and 58. ▮ No. 56 related the unconsciousness mentioned in section 26, Penal Code, as making a person incapable of committing a crime (which section the court read to the jury) to the particular act with which the defendant was charged. The failure to give this proposed instruction could not possibly have been harmful or even error, as a reading of the instructions as a whole clearly shows that they cover the subject. The same is true of the refusal to give proposed instruction 57. This instruction attempted to further define unconsciousness. The instruction given by the court and taken from CALJIC 71-C gave practically the same definition. ▮ Defendant's proposed instruction 58 was to the effect that if the jury had any reasonable doubt as to whether defendant's acts were committed while unconscious, then it should find defendant not guilty, that consciousness must be proved by the prosecution beyond a reasonable doubt and that in determining if that burden had been met, the jury must take defendant's statements "as unrefuted testimony as to the true condition of the defendant . . ." While the first portions of this instruction 58 were correct statements of the law, the final statement is not, and hence the court properly refused to so instruct. ▮ As we heretofore pointed out, statements of defendant introduced by the prosecution are unrefuted only in the absence of proof to the contrary. (See *People* v. *Toledo*, 85 Cal.App.2d 577, 581 [193 P.2d 953], and the

other cases heretofore cited.) The portions of this instruction dealing with burden of proof were fully covered by other instructions on that subject given by the court. While the evidence of unconsciousness was very slight, if any, the court fully instructed upon the subject.

The most serious question arises with reference to an instruction given by the court, which instruction was apparently based upon one condemned in *People* v. *Hardy*, 33 Cal.2d 52 [198 P.2d 865], but in which the objectionable feature was attempted to be eliminated. The first sentence of the instruction given follows: "If the evidence shows that the defendant acted as if he were conscious, the law presumes that he then was conscious." That sentence was approved in the Hardy case, the court saying (p. 63): "There is no *statutory* presumption that a man is conscious merely because he acted as if he were conscious. (See Code Civ. Proc., §§ 1959, 1961, 1962 and 1963.) Such a presumption, however, appears to have been recognized by judicial decision." The second sentence is: "Since the matter relates to the defendant personally, and lies peculiarly within his knowledge, the law places upon the defendant the burden of producing such evidence thereon as will overcome the presumption and create a reasonable doubt in the minds of the jury as to whether he was in fact conscious or unconscious." That sentence did not appear in the Hardy case instruction, although the court gave as one of the reasons for raising the presumption that the matter relates to the defendant personally and lies peculiarly within his own knowledge and that "hence for reasons of convenience and necessity he should have the burden of producing evidence thereon." (P. 64.) There is nothing objectionable, however, in it. In the Hardy case the instruction went on to state in effect that the defendant must overcome the presumption by a preponderance of the evidence. The court held that such statement made the instruction erroneous as it deprived the defendant of the doctrine of reasonable doubt. It then held that when such presumption arises the defendant is only required "to produce sufficient evidence to raise a reasonable doubt in the minds of the jury." The defendant's burden, "however, involves merely the duty of going forward with the evidence and of raising a reasonable doubt, and not the duty to overcome the presumption by a preponderance of the evidence." (P. 64.)

Perhaps the instruction would be better if the language "overcome the presumption" were omitted. However, taking the instruction as a whole it told the jury that defendant's burden with reference to the presumption, if it arose, was to create a reasonable doubt as to whether defendant was conscious. Certainly the instruction did not, as claimed by defendant, require him to prove unconsciousness "beyond a reasonable doubt and to a moral certainty." We do not see how, under the facts of this case and of the decision in the Hardy case, the instruction was erroneous.

## CONDUCT OF DISTRICT ATTORNEY

 During his argument the assistant district attorney stated "why didn't his wife come in and testify?" Defendant made no objection to this statement. In fact, in his argument defendant stated that the comment on this subject was "a two-edge sword used by the District Attorney." Defendant then for three pages of the transcript gave his reasons for not calling the wife, emphasizing her blind condition. It would appear that defendant welcomed the opportunity given him to discuss this subject. Certainly the remark of the district attorney was improper and should not have been made, and if called to the attention of the court would undoubtedly have been stricken and the jury admonished concerning it. Where objection is made and the court properly admonishes the jury to disregard the district attorney's comment it has been held repeatedly that such comment although misconduct is not prejudicial. (See *People v. Klor*, 32 Cal.2d 658, 663 [197 P.2d 705] ; *People* v. *Harmon*, 89 Cal.App.2d 55, 61-62 [200 P.2d 32].) *People* v. *Wilkes*, 44 Cal.2d 679 [284 P.2d 481], where the misconduct was held prejudicial, is not applicable here, because there, on objection being made to the comment, the court not only failed to admonish the jury but appeared to approve the comment. Under the circumstances of our case the misconduct was not prejudicial.

 In commenting upon defendant's failure to take the stand the district attorney stated, "I'm not smug, but from the evidence *given to me* by George Murray and by Arthur Christiansen [two police officers who were witnesses at the trial] Mr. Martina knew he couldn't take the stand. . . ." (Emphasis added.) Defendant immediately assigned this as misconduct, as being a statement of the district attorney concerning evidence outside of the courtroom. The court in-

structed the jury to disregard the statement and the district attorney stated that he made no statement of evidence out of the courtroom, that he was discussing the evidence. While the statement appears to be equivocal the district attorney's later statement cleared it up. This fact and the admonishment by the court resulted in no prejudice to defendant.

### TORTURE

Defendant complains of the giving of an instruction on first degree murder, claiming that as there was no element of poisoning, lying in wait, arson, rape, robbery, burglary or mayhem established there was no evidence to support such an instruction. For the same reason defendant also complains of the district attorney's asking for defendant's conviction of first degree murder and referring to defendant as a sadist.

The testimony of Mrs. Weir that she heard a scream, sobbing and crying for 10 to 15 minutes and cries of "You hurt me so," together with the medical evidence that the deceased must have been struck several times, was evidence of "torture, or by any other kind of willful, deliberate, and premeditated killing" (part of the definition of first degree murder, section 189, Penal Code) and that "the 'intention unlawfully to take away the life of a fellow creature' was a considered intent arrived at or carried out as the result of deliberation and premeditation" which *People* v. *Bender*, 27 Cal.2d 164, 178 [163 P.2d 8], holds is necessary to constitute first degree murder. As we said in *People* v. *Teixeira*, 136 Cal.App.2d 136, 150 [288 P.2d 535] : "Normally, hitting a person with the hands or feet does not constitute murder in any degree. *People* v. *Munn*, 65 Cal. 211 [3 P. 650] ; *People* v. *Kelley*, 208 Cal. 387 [281 P. 609] ; see anno. 22 A.L.R.2d 854.) But if death or great bodily harm is a reasonable or probable consequence of the beating the offense may be murder. (See anno. 24 A.L.R. 666.) Thus, to constitute murder there has to be either an intent to kill or such wanton and brutal use of the hands without provocation as to indicate that they would cause death or serious bodily injury so as to indicate an abandoned and malignant heart." As stated in *People* v. *Taylor*, 36 Cal. 255, 265: "It is argued on the part of the defendant that the case made by the prosecution was, at most, but a homicide, committed in a sudden and mutual combat, and that the Court should, therefore, have confined its charge to the law of manslaughter and the law of self defense. This would be so,

doubtless, if the theory of the appellant was the only plausible theory, or if the prosecution accepted it as the true theory, (*People* v. *Byrnes,* 30 Cal. 206) but the prosecution claimed that it was a case of murder; and it cannot be denied that there was some testimony to support the claim. It may have been very slight, but if there was any testimony tending that way it would have been error to refuse to charge upon the question of murder.''

The jury did not find defendant guilty of first degree murder. Although there was evidence to permit the prosecution to try their theory of torture and hence the trial court rightly gave instructions on such theory, the jury failed to be persuaded and rejected the People's argument. Under these circumstances there could be no prejudice in the instructions of the court or the argument of the People.

The judgment and order are affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.