[Crim. No. 6711. Second Dist., Div. One. July 5, 1960.]

THE PEOPLE, Respondent, v. WILLIAM ROBINSON LINT, Appellant.

Harold J. Ackerman, under appointment by the District Court of Appeal, for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Respondent.

FOURT, J.—This is an appeal from a judgment entered upon a jury's verdict which found the defendant guilty of murder in the second degree.

An information was filed in Los Angeles County on October 8, 1958, charging the defendant with the crime of murder, in violation of section 187 of the Penal Code in that he did, on or about September 4, 1958, feloniously and with malice aforethought, murder Pamela Sue Rowe, a human being. The defendant pleaded not guilty to the charge. On December 19, 1958, after six days of trial before a jury a verdict of guilty of murder in the second degree was returned. An application for probation was made and denied and the defendant was sentenced to the state prison on January 19, 1959.

A résumé of the facts is as follows:

On September 4, 1958, and for a short time prior thereto, Pamela Sue Rowe, aged about four and one-half years, was living with her mother; her brother, William, aged about six years; her half-brother (the child of her mother and the de-

fendant), aged about four months; and the defendant in a two story apartment located at 3020 Glenn Avenue, Los Angeles. Pamela Sue Rowe, hereinafter referred to as the victim, was the child of Maudine Eloise Rowe who had previously been married to a man by the name of Rowe. Maudine Rowe was, on the date in question, living with the defendant as his wife and was sometimes referred to and known as Mrs. Lint, although no marriage ceremony had been performed between them.

The apartment in which the group resided as a family had a lower floor containing a dining and living room area, kitchen, etc., an inside stairway leading to the upstairs where there were bedrooms and a bathroom. The building was so constructed that it was not soundproof and noises made in one apartment could easily be heard in an adjoining apartment. Mr. and Mrs. Dent lived in the apartment numbered 3018 Glenn Avenue which was next door to the apartment occupied by the defendant and those heretofore mentioned. The living room and dining room wall of the Dent and Lint apartments was a common wall and likewise the upstairs bedroom wall was a common wall. Mrs. McBroom lived two doors from the defendant's apartment in the same building unit. Mr. and Mrs. Gilbreath also were nearby neighbors of the defendant.

About 7:30 p. m., September 4, Mrs. McBroom and Mrs. Rowe left the apartment house together to attend a housewarming of a friend. When they left the victim was seated in front of and watching the television. The defendant was also there as were the other two children. At about 8:15 p. m. Mrs. Gilbreath went to the apartment of the defendant to borrow a pencil. At that time Mrs. Gilbreath was permitted to enter and she went inside the dining-living room area and observed that the television set was not turned on and that none of the children could be seen.

At about 9 p. m. Mrs. Dent, next door, heard a heavy thud against the common wall of the apartments. Shortly thereafter she heard another thud against the wall and then she heard the victim cry out. This occurred three or four times. Each cry of the victim was preceded by a thud. The outcries made by the victim and the thudding sounds were loud enough to be heard above the television which was in operation in the Dent apartment. Mrs. Dent turned down her television set "to see if she could hear anybody's voices." She further stated that she thought Mrs. Lint was in trouble. She then went to her back door to see if she could hear any other voice

but there was none to be heard. She described the outcries of the victim as "painful and frightened" cries. The sounds seemed to come from the downstairs dining room area of the Lint apartment and stopped at about 9:20 p. m.

At about 11:15 p. m. Mrs. Gilbreath brought her husband home from work and at that time Mr. Gilbreath saw the defendant at the upstairs window of the bedroom in the Lint apartment wearing a light colored tan or beige shirt. At about 12:15 a. m. September 5, 1958, Mr. Gilbreath heard water running for about 20 minutes in the kitchen of the Lint apartment. Mrs. McBroom and Mrs. Rowe returned to the Lint apartment at 2 a. m., September 5.

At about 1:05 a. m. Officer Hatter and his partner, Officer Longuevan, went to the American Hospital at 1925 Trinity Street in response to a police radio call. The officers saw the victim and "she was a mass of bruises from the top of her head to the bottom of her feet." The officers talked to the defendant in the room where the victim was receiving oxygen and Hatter asked him what caused all of the bruises and marks on the body of the victim. The defendant told Hatter that the child had fallen down the steps twice that day; once earlier before the mother had left (prior to 7:30 p. m., September 4, 1958) and once later on in the evening after the mother had left.

At about 3:30 a. m., Officer Jacquez, who was attached to the detective bureau, arrived at the Lint apartment and entered. He was met there by Sergeant Ellis of the Los Angeles Police Department. An inspection or examination of the steps of the stairway was made and there was no evidence of blood or other substance on the tread of the stairs or otherwise. The steps of the stairs were covered with dust with the exception of the forward part of the tread or nosing upon which one would step when going up or down the stairway.

Officer Jacquez was the first officer to enter the apartment and to inspect the stairway. Jacquez talked to the defendant at about 9:30 a. m. on the 5th of September and at that time the defendant told the officer that he was in the kitchen when Mr. Gilbreath came home during the night but that he did not see Mr. Gilbreath.

About 6 a. m. on September 5, Officer Lee of the Los Angeles Police Department, an investigating officer in the case, was at the apartment and examined the stairway. He "was unable to detect anything that resembled blood spots or smears in any degree whatever. There was dust, however, a thin film

of dust across the steps'' towards the back and sides. There was no evidence on the steps of any spots having been wiped away.

An autopsy was performed upon the victim by Dr. Gerald Ridge of the coroner's office. The doctor qualified as an expert. He had had many years of experience and had performed hundreds of autopsies. It was stipulated that he was an expert in the field of examining bodies of dead people and determining, if possible, the cause of death. In the opinion of the doctor the death of the victim was caused by acute traumatic subdural hemorrhage and other conditions including, among others, multiple contusions and abrasions. The injuries were, in the opinion of the doctor, of recent origin and some of them would not have been likely to occur as the result of a fall. He stated that the injuries to the throat of the victim could have been caused by a human hand acting in a choking force or manner and in his opinion would not have been the result of a fall down the stairs. Further, the doctor stated that if the injuries to the head had been caused by a fall down a flight of stairs he would have expected to find blood on the steps of the stairs, and he stated that in the absence of any blood on the stairs it was his opinion that the victim did not suffer the wounds characterized by appreciable bleeding from a fall down the steps. The wounds were sustained at or about the same time and (with one exception), in the doctor's opinion, the injuries were incurred between 7:30 p. m. of September 4, 1958, and 12 midnight of the same day. The doctor stated in effect that, based upon his years of experience and the appearance of the particular deceased victim at the time he examined her and considering the total picture, consisting of the multiplicity of discolorations, bruises, abrasions and some lacerations, that he did not believe that such injuries could have resulted from a fall. The doctor also concluded, due to the fact that blood was found in the lungs and the fact that no blood was found in the stomach that the victim was unconscious when the bleeding occurred. He stated further that there were only two kinds of situations in which he had found injuries of the intensity and distribution which were present in this case; first, in automobile accident cases and second, in the case of beatings. The doctor stated that the body of the victim revealed about 43 separate and distinct injuries, some of which would have produced a substantial amount of bleeding. As summarized in respondent's brief, it is set forth: ''There were abrasions, contusions, ecchymoses,

and bruises on the top of the skull, the back of the head, at the junction of the neck and shoulders, at the hairline of forehead, at several places on the forehead, on the nose, the left cheek, the upper lip, the lower lip, the left point of the chin, beneath the point of the chin, on the upper throat, underneath the right jaw, on the right surface of the face, the right cheek, the right chin, in the helix of the right ear, on the left face, the front of the neck, and over the steno-clavicular joint.'' The doctor stated that the most of the injuries if taken separately and individually, could have been caused accidentally. He also stated that several of the injuries would be most unlikely to occur in falling down a flight of stairs and that some of the injuries, in his opinion, did not result from such a fall downstairs. The doctor also was of the opinion that the force causing the abdominal bleeding was more likely the result of a blow and was more appreciable than would be expected in a fall down the stairway.

About 5 p. m. or a little afterward on September 4, 1958, the victim visited Mrs. Gilbreath for about 20 to 25 minutes. Mrs. Gilbreath had just purchased a parakeet and the victim was looking at the bird and playing with it. At that time Mrs. Gilbreath saw the victim and she did not have any ''damages or bruises on her that you could see.'' The witness was shown a colored picture of the victim which depicted her condition shortly after her death and she stated that the victim did not bear any such marks nor did she appear to be in any such condition when the witness last saw the victim between 5 and 6 p.m. on September 4, 1958.

At about 6 p. m. on September 4, 1958, the victim visited with Mrs. McBroom. While she was there Mrs. McBroom, the witness, held the victim on her lap and talked to her and looked at her carefully. The witness did not notice any injuries, or damages to the victim. She had known the victim about four and one-half weeks, had seen her walk and play, and she stated that she had not noticed any indication of any crippled condition or deformity in the walk or movements of the victim. Mrs. McBroom saw the victim about 7:30 p. m. just prior to leaving for the housewarming with the mother of the victim and at that time the witness did not notice any damage or injury to the victim.

In the afternoon of September 4, 1958, the victim was playing with the children of Mrs. Dent and at that time Mrs. Dent did not notice any of the bruises, injuries or damage to the person of the victim.

We have had an opportunity to view the pictures of the victim taken after her death. If the bruises, blood and discoloration depicted in the pictures were present at the times the various witnesses last saw the victim, it would be difficult indeed for them to escape notice.

On August 26, 1958, the victim visited at the home of her uncle, Mr. Adcock, and the only injuries he noted on the victim at that time were a small bruise on the forehead which had practically faded away and a small bloodshot spot in one of her eyes.

On August 13, 1958, at the apartment of the defendant, Mr. and Mrs. Adcock were present. The defendant took the victim onto his lap and put his hand behind her neck in a clamping fashion, by placing his fingers on one side of her neck and the thumb on the other side. She started to cry and tried to get away from the defendant but he held onto her. When the Adcocks got up to leave the apartment, the defendant was told by Mrs. Rowe to put the child down and he did so.

At about 8 a.m. on Tuesday, September 2, 1958, Mrs. McBroom heard the sounds of quarreling coming from the apartment of the defendant. The voices of Mrs. Rowe and the defendant could be heard and the victim was heard crying. Mrs. Rowe was heard saying, "Don't hit her again, Bill." The words spoken by the defendant could not be made out but his tone of voice was loud and harsh. At about 9 a.m. of that same morning Officer Sullivan of the Los Angeles Police Department received and answered a radio call to go to the apartment of the defendant. When the officer arrived at the apartment he saw the defendant, the victim and Mrs. Rowe. The mother of the victim pulled down the child's undergarments and showed the officer the buttocks of the victim. The buttocks appeared to the officer to be red as if she had been spanked. The mother stated to the officer that the little girl was not noticeably bruised at that time but "you should see her before when he has beaten her." The officer stated to the defendant, "you shouldn't punish the child when you are in a fit of anger" and the defendant answered that he was "not angry until he got started."

The defense in effect was that the child had a crippled knee and that she had twice fallen down the stairs after the mother had left for the housewarming and that the defendant had not struck or beaten the child.

There were many inconsistencies and discrepancies in the

testimony of the defendant and the same was true with reference to the testimony of Mrs. Rowe.

Appellant now asserts that: (1) the evidence is insufficient as a matter of law to sustain the judgment; (2) the trial judge erred as a matter of law in admitting certain hearsay testimony concerning statements made by Mrs. Rowe prior to the death of the victim and which were prejudicial; (3) the trial judge erred as a matter of law by allowing testimony of alleged past conduct to show predisposition and which testimony was prejudicial; and (4) the court erred as a matter of law in excluding the former testimony of an absent witness taken at the coroner's inquest.

With reference to the first contention having to do with the insufficiency of the evidence. ██ This court must keep in mind the rule as stated by this court in *People* v. *Mangiameli*, 149 Cal.App.2d 642, 644-645 [308 P.2d 762], wherein it is set forth:

". . . Where evidence, circumstantial or otherwise, establishes that a crime has been committed and that the accused was the prepetrator thereof, an appellate tribunal in reviewing a conviction will not appraise the weight of the evidence but will consider and determine only whether upon the face of the evidence it can justly be held that the trier of facts could not have found sufficient facts to warrant the inference of guilt. In other words, it must be made clearly to appear that the conclusion arrived at in the court below is unsupported by any substantial evidence upon any hypothesis whatever (*People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778]). ██ As was said in the case just cited, at page 681: 'We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict. ██ If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury.' "

██ Malice in a murder case may be either express or implied. It is implied when there is no considerable provocation or when the circumstances attending the killing show an abandoned or malignant heart. In the case before us there is ample evidence to sustain the verdict which in effect determined that the defendant had an abandoned and malignant

heart and did without provocation or justification kill Pamela Sue Rowe. (See *People* v. *Cole,* 47 Cal.2d 99, 106 [301 P.2d 854, 56 A.L.R.2d 1435].)

No useful purpose would be served in repeating the evidence which has heretofore been set forth, but suffice it to say that what has heretofore been stated, coupled with the showing of defendant's propensity to torment the victim on several occasions is sufficient in our opinion as a matter of law to establish the offense of murder. The jury in this case had either to believe the defendant in his statements to the effect that the litle girl twice fell down the stairs the night of September 4, 1958, or it had to infer from the evidence that the defendant inflicted the damage himself. There were ample grounds for the jury to believe the opinion as expressed by the doctor expert who in effect eliminated the falling down stairs as the cause of the injuries and left the inference that the victim died from the beating which was received at the hands of the defendant. The jury obviously did not believe the defendant in all of his testimony. We cannot say that there was no reasonable hypothesis whatever upon which to base an inference of guilt.

The fact that the evidence may be susceptible of an inference of innocence does not warrant a reversal of the judgment. (See *People* v. *Martina,* 140 Cal.App.2d 17, 20-23 [294 P.2d 1015]; *People* v. *Burns,* 109 Cal.App.2d 524, 526-534 [241 P.2d 308, 242 P.2d 9].) In the case of *People* v. *Camargo,* 130 Cal.App.2d 543, 548-549 [279 P.2d 194], the question involved was whether a baby had died as a result of an accidental fall or through mistreatment. Expert testimony was introduced to show that the brain hemorrhage suffered by the deceased was produced by violence and that the child suffered multiple injuries and that the defendant had treated the child roughly when playing with him. The defendant contended that he had accidentally dropped the child. The court said in deciding the matter:

"It is also true that although both the corpus delicti and the defendant's guilt can be proved by circumstantial evidence (*People* v. *Murillo,* 119 Cal.App. 59, 63-64 [5 P.2d 897]; *People* v. *Cullen,* 37 Cal.2d 614, 624 [234 P.2d 1]; *People* v. *Huizenga,* 34 Cal.2d 669, 675-676 [213 P.2d 710]; *State* v. *Kader,* 201 Ore. 300 [270 P.2d 160]; *State* v. *Plunkett,* 62 Nev. 258 [149 P.2d 101, 107]), there must be evidence from which it can reasonably be inferred that the external force or violence causing the death was applied by another and was not

self-inflicted or the result of an accident. (*Hall* v. *Superior Court*, 120 Cal.App.2d 844, 849 [262 P.2d 351].) . . .

"While we believe that it could be reasonably inferred that the fall on Saturday was the external force which caused the fatal brain injury, we also feel that it could be reasonably inferred that appellant dropped the baby, not as he testified when he was reaching for a spoon, but while engaged in the same kind of maltreatment he had been seen to inflict upon it, such as bouncing the baby up and down on the bed, tossing it into the air and catching it in his hands, and squeezing it to stop its crying. There was evidence of a course of conduct in the handling of the baby which, coupled with the serious injuries which it had received, would warrant the jury in concluding that the child had been injured by such conduct. The baby's injuries themselves speak loudly to the point. Further, there was admitted in evidence, without objection, the statement by appellant to the investigating officers four days after the baby's death, wherein he admitted that his handling of the baby had resulted in its death. Said he: 'I know whatever I done was wrong. I killed my son.' The jury was not compelled to accept the testimony of either the appellant or his wife given at the trial. By its verdict it rejected appellant's contention and inferred that appellant's unlawful treatment of the infant occasioned its many injuries and its death. As the inference drawn from the direct and circumstantial evidence presented was a reasonable one, the jury's conclusion will not be disturbed on appeal. (*People* v. *Clark*, 116 Cal. App.2d 219, 223 [253 P.2d 510].)"

With reference to the episode which occurred on the morning of Tuesday, September 2, 1958, Mrs. McBroom was asked, "What did you hear?" She was then permitted to testify that at about 8 a.m. on that day she heard the sounds of Mrs. Rowe and the defendant quarreling and the sound of the victim crying and defendant speaking in a harsh tone of voice and that she understood the mother of the victim to say to the defendant, "Don't hit her again, Bill." Counsel for the defendant objected to the question which elicited the above facts on the ground that it was hearsay although the prosecutor stated that the defendant was present at the quarrel. The prosecutor argued that the evidence was proper to show the "conduct and disposition" of the defendant towards the child even though it perhaps showed other acts of the defendant. Counsel for the defendant then objected upon the ground that the matter was irrelevant.

The deputy district attorney offered to prove that the testimony of Mrs. McBroom would be substantially as above set forth and that it would be followed by the testimony of Officer Sullivan who had received a call to go to the defendant's apartment; that the mother had shown the officer the buttocks of the child in the reddened condition; and to have related conversation related between the officer, the defendant and Mrs. Rowe with reference to the previous condition of the child after whippings and the whipping of the child when defendant was angry. The offer of proof was for the "sole purpose of showing his attitude and disposition toward the child." The witness did not understand any of the words said by the defendant at the time.

Counsel for defendant apparently abandoned any objection of hearsay and objected to the witness testifying upon the grounds of relevancy, arguing that it was highly improbable that anything said or done could be interpreted to show a malignant heart towards the child and that the more probable interpretation of the evidence was simple discipline of a child by a parent. The deputy district attorney stated that he felt that the statement of the defendant to the policeman, "I didn't become angry until I started" was of the essence of his theory of murder by torture and that the defendant was a sadist and "got pleasure and satisfaction out of torturing the child." The court then stated that he was going to permit the evidence to be presented to the jury saying that the weight was for the jury to determine. Counsel for the defendant then argued that the weight of the evidence was so small as to be worthless and therefore it was not relevant.

The defendant knowingly waived his objection to the evidence as hearsay in the trial court and shifted to a claim of no relevancy. ■ It was appropriately said in *People* v. *Dement*, 48 Cal.2d 600 at 604 [311 P.2d 505] : ". . . In the absence of a seasonable objection in the trial court the defendant should not now be permitted to assign as error the admission of this testimony. (Citation.) Particularly in the case of hearsay evidence objections unless made are waived and cannot be urged for the first time on appeal. (Citations.)"

■■ This court said in *People* v. *Renek*, 105 Cal.App.2d 277 at 283 [233 P.2d 43] :

". . . To warrant consideration by an appellate tribunal of an objection to evidence, it is necessary that the precise ground for its exclusion must have been clearly specified to the trial court (*People* v. *Goff*, 100 Cal.App.2d 166, 172 [223 P.2d 27] ;

*People* v. *Calliham,* 81 Cal.App.2d 928, 933 [185 P.2d 342] ; *People* v. *Agajanian,* 97 Cal.App.2d 399, 405 [218 P.2d 114].)''

 ''. . . [A] party cannot be permitted to abandon the ground of objection taken below and assume another one here.'' (*People* v. *McCauley,* 45 Cal. 146, 148.)

 Appellant, as heretofore indicated, asserts that there was no relevancy to the evidence which tended to show the defendant's past conduct with reference to the child. Witkin, California Evidence, section 111(c), page 133, under the title of ''Relevancy,'' states:

''(c) Relevancy. In its more precise sense, relevancy is concerned with the probative quality of the evidence offered. Relevant evidence is defined as 'evidence having any tendency in reason to prove any material fact.' (Citing authorities.) ['Relevancy, as the word itself indicates, is not an inherent characteristic of any item of evidence but exists as a relation between an item of evidence and a proposition sought to be proved'] ; McCormick, p. 315 ['Relevancy, as employed by judges and lawyers, is the tendency of the evidence to establish a material proposition'] ; *Firlotte* v. *Jessee* (1946), 76 Cal. App.2d 207, 210, 172 P.2d 710 ['Evidence is relevant not only when it tends to prove or disprove the precise fact in issue, but when it tends to establish a fact from which the existence or nonexistence of the fact in issue can be directly inferred'] ; *People* v. *Jones* (1954), 42 Cal.2d 219, 222, 266 P. 38; 2 U.C.L.A. L. Rev. 5.)''

The defendant in this case defended the charge of murder by claiming that the child died from an accident. The evidence shows that although the defendant, Mrs. Rowe and the children lived together as a family unit and that perhaps there were at times amicable relations between the defendant and the victim, there also were indications which clearly point to severe beatings and disciplinary action far beyond that which might be termed ordinary action. There is no claim by the defendant that there was any sufficient provocation for any such conduct.

The jury could well have received appreciable help from the testimony. The jury likewise could have considered the evidence and determined that it tended to show a course of conduct or a pattern of behavior in support of the inference that the defendant killed the victim by beating her. In *People* v. *Hopper,* 145 Cal.App.2d 180 [302 P.2d 94], the court held that it was permissible to admit testimony of previous beatings of the defendant's wife who later was killed by a beating and that it was not error to admit testimony as to bruises seen on

the victim during the five years preceding her death where the testimony was accompanied by evidence as to the defendant's proximity. In *People* v. *De Moss,* 4 Cal.2d 469, 474 [50 P.2d 1031] it is said:

"The several assignments of error having to do with the asserted improper admission of evidence tending to establish prior quarrels between the decedent and the defendant and the making of threats by the latter, are clearly without merit. Such evidence was competent to show motive and the state of mind of the defendant. The objection that the evidence is remote goes to its weight rather than to its admissibility. . . ."

In *People* v. *Grasso,* 142 Cal.App.2d 407 [298 P.2d 131], the court placed its stamp of approval upon receiving evidence of previous fights and arguments between the defendant and his father, the deceased. In *People* v. *Ogg,* 159 Cal.App.2d 38 [323 P.2d 117], the defendant claimed his wife died as a result of a fall. The court affirmed his conviction of murder in the second degree and stated in effect that it was proper to receive evidence of his past conduct in striking her. Furthermore, it was important and proper to receive the testimony under consideration in this case for it had a considerable bearing on whether the murder was by torture, in the first degree as contended by the prosecution or whether it was as determined by the jury to be, namely, murder in the second degree.

In *People* v. *Palassou,* 14 Cal.App. 123, 127 [111 P. 109] the court said with reference to evidence of repeated cruelty by the defendant to his wife as follows:

". . . The evidence was not allowed for the purpose of showing a distinct and unconnected crime, but for the purpose of showing the course of conduct of the defendant toward his wife on prior occasions which ultimately culminated in her death. Such conduct and such acts leading up to and directly connected with the crime with which the defendant is charged would certainly shed light upon the questions as to the defendant's motive and as to whether or not the death was the result of defendant's blow or of an accident. It is not a case of where the court allowed proof of a separate and distinct crime not connected with the offense for which the defendant was being tried. And the courts have uniformly held that evidence which shows a motive or throws light upon the facts and circumstances leading up to the particular crime is admissible, although the acts and conduct on prior occasions may have of themselves constituted a distinct crime." (See also *People* v. *Wells,* 33 Cal.2d 330, 341-342 [202 P.2d 53] ; *People* v. *Cava-*

*naugh,* 44 Cal.2d 252, 266 [282 P.2d 53]; *People* v. *Moore,* 48 Cal.2d 541, 546-547 [310 P.2d 969].)

Appellant also argues that the conversation was incomplete so far as the witness was concerned and therefore she should not be permitted to testify as to any part of what she heard. The rule is that "a witness may testify to part of a conversation if that is all that he heard and it appears to be intelligible." (*People* v. *Adamson,* 27 Cal.2d 478, 485 [165 P.2d 3].) In this case the part which Mrs. McBroom heard was intelligible and the meaning was clear. The evidence was introduced for the limited purpose of indicating the disposition of the defendant toward the child on the issue of the prosecution's theory of torture. The claim of the defense was that the victim had "accidentally fallen down the stairs."

The second occasion to which the defendant objects under his second contention occurred during the rebuttal testimony of Mrs. McBroom. Mrs. Rowe had testified as a witness for the defendant and during her cross-examination she was asked if it was not true that about four days after they had moved into the apartment that Pamela had two black eyes. Mrs. Rowe answered that it was not true. She said in effect that the eyes were not black but just looked black. She was asked if she had had a talk with Mrs. McBroom about the black eyes and she said she might have and maybe Pamela did. The question was then put, "Did you say to Mrs. McBroom four days after you moved in, 'She got those two black eyes falling down the steps' and did Pamela speak up and say, 'No, daddy hit me.'?" The witness answered, "No, sir." Counsel for the defendant moved to strike the answer for the purpose of making an objection and the answer was so stricken. An objection was then made upon the ground that the question assumed facts not in evidence. The court had the question read back to the witness and she answered, "No, sir, I didn't, because I didn't know the woman." No ruling was made by the court and none was asked for by counsel other than as here indicated. No further objection was made to such testimony. It is reasonable to assume that counsel abandoned any objection he might have had. The defendant argues before this court that it was inadmissible hearsay. There was no objection in the trial court to the effect that the testimony was hearsay and he thereby waived any right to complain here of such for the first time.

On rebuttal Mrs. McBroom stated that she saw

Mrs. Rowe and the victim about four days after they moved into the apartment and that the child had two black eyes and a bruised face and that Mrs. Rowe had said, ''She fell down stairs and blacked her eye'' and the witness had then said to Pamela, ''Pamela, I'm sorry you fell down the stairs and hurt yourself, honey'' and then Pamela said, ''Daddy hit me.'' There was no objection in the trial court to any of this testimony. The defendant must be deemed to have waived any right to now complain. The testimony was proper for a number of different reasons. For one thing, it was proper on the issue of bias of the witness. The testimony could have indicated that Mrs. Rowe had knowledge of the defendant's brutal tendencies and either condoned or acquiesced in them. It was said in *People* v. *Winston*, 46 Cal.2d 151, 157 [293 P.2d 40] : ''. . . Although the extent of cross-examination on any 'fact which tends to impeach the credibility of a witness . . . rests very largely in the discretion of the trial court' (27 Cal. Jur., § 96, pp. 122-123), nevertheless considerable latitude should be allowed to show the witness' state of mind and possible bias. (*People* v. *Pantages*, 212 Cal. 237, 255 [297 P. 890] ; *People* v. *Evans*, 113 Cal.App.2d 124, 127 [247 P.2d 915].) ''

It was said in *People* v. *Evans*, 113 Cal.App.2d 124, 127 [247 P.2d 915] : ''. . . Questions which have a tendency to show bias of a witness are not only competent, but great latitude in cross-examination should be allowed in developing its existence. (*People* v. *Pantages*, 212 Cal. 237, 255 [297 P. 890].) '' Defendant made no request for a particular instruction to the effect that the jury was to consider the matters so testified to for a limited purpose only.

 The next contention of the appellant is to the effect that the testimony of the past misconduct of the defendant to show predisposition was prejudicial. Appellant first refers to the occasion when Mr. Adcock was present at the defendant's apartment on August 13, 1958, about three weeks before the murder, when defendant held the victim on his lap, grasped her by clamping his hand around her neck with his fingers and she tried to get away but defendant continued to hold her until told by Mrs. Rowe to release her.

 The second occasion of which appellant complains has to do with the testimony of Officer Sullivan with reference to the episode which occurred two days before the murder. The statement of Mrs. Rowe in the presence of Officer Sullivan and the defendant indicated that the defendant had severely beaten the child in the past. Furthermore, there was

no objection by the defendant to the testimony of the officer. The evidence tended to show that the defendant had a disposition toward malicious maltreatment of the victim. Further, the defendant remained silent throughout the accusation made by Mrs. Rowe to the effect that, ''You should see her before when he has beaten her.'' The accusatory statement doctrine of *People* v. *Simmons*, 28 Cal.2d 699, 712-713 [172 P.2d 18], is applicable.

Considering next the appellant's contention that it was error to exclude the former testimony of an absent witness at the coroner's inquest. William Rowe, the brother of the victim, gave testimony at the coroner's inquest. At the time of the trial he was living with his father in Savannah, Georgia. The defendant sought to introduce into evidence a transcript of the boy's testimony at the coroner's inquest.

Section 1870, subdivision 8 of the Code of Civil Procedure and section 686, subdivision 3 of the Penal Code are set forth below.[1]

---

[1]Section 1870, subdivision 8, Code of Civil Procedure provides:

''§ 1870. Facts which may be proved on trial. In conformity with the preceding provisions, evidence may be given upon a trial of the following facts:

''. . . . . . . .

''8. The testimony of a witness deceased, or out of the jurisdiction, or unable to testify, given in a former action between the same parties, relating to the same matter; . . .''

Section 686, subdivision 3, Penal Code provides as follows:

''§ 686. Defendant's rights; speedy and public trial; counsel, production of witnesses; confronting adverse witnesses; exception.

''In a criminal action the defendant is entitled:

''. . . . . . . .

''3. To produce witnesses on his behalf and to be confronted with the witnesses against him, in the presence of the court, except that where the charge has been preliminarily examined before a committing magistrate and the testimony taken down by question and answer in the presence of the defendant, who has, either in person or by counsel, cross-examined or had an opportunity to cross-examine the witness; or where the testimony of a witness on the part of the people, who is unable to give security for his appearance, has been taken conditionally in the like manner in the presence of the defendant, who has, either in person or by counsel, cross-examined or had an opportunity to cross-examine the witness, the deposition of such witness may be read, upon its being satisfactorily shown to the court that he is dead or insane, or can not with due diligence be found within the state; and except also that in the case of offenses hereafter committed the testimony on behalf of the people or the defendant of a witness deceased, insane, out of jurisdiction, or who can not, with due diligence, be found within the state, given on a former trial of the action in the presence of the defendant who has, either in person or by counsel, cross-examined or had an opportunity to cross-examine the witness, may be admitted.'' (Enacted 1872. As amended Stats. 1911, ch. 187, p. 364, § 1.)

Fricke, California Criminal Evidence, 4th edition, page 456, sets forth the following:

"Section 686 is exclusive and prescribes the only circumstances under which the former testimony may be given in evidence as proof of the facts therein recited. The fact that, though within reach of a subpoena the witness is too ill to appear before the court is not one of the instances in which the former testimony of the witness may be read at the trial. (*People* v. *Bojorquez,* 55 Cal. 463; *People* v. *Rinesmith,* 40 Cal.App.2d 786 [105 P.2d 1021].) Neither does the law permit the reading upon a trial of the testimony of a witness given before the grand jury (*People* v. *Day,* 199 Cal. 78 [248 P. 250]) or at a coroner's inquest (*People* v. *Heacock,* 10 Cal.App. 450 [102 P. 543]) or upon any other occasion than a preliminary examination, the conditional examination of the witness or upon a former trial and then only if it was given in such proceedings in the same action as that which is on trial. (*People* v. *Hall,* 87 Cal.App. 634 [262 P. 50].)

"Section 1870 of the Code of Civil Procedure does not apply to criminal trials, the latter being governed by Section 686 of the Penal Code. (*People* v. *Frank,* 132 Cal.App. 360 [22 P.2d 792].)"

In *People* v. *Frank,* 132 Cal.App. 360, 367-368 [22 P.2d 792], it is stated:

"Transcript of testimony given by the witness Tadashi Wakabayashi in the trial which grew out of the Long Beach shooting incident was offered in evidence. This evidence involved some of the same issues connected with the present case. The objection of the state to its admission was sustained. Penal Code, section 1102, provides that the rules of evidence in civil actions are applicable also to criminal actions except as otherwise provided in this code. Subdivision 8 of section 1870 of the Code of Civil Procedure provides that the testimony of a witness deceased, given in a former action between the same parties relating to the same matter, may be given upon trial. Penal Code, section 686, subdivision 3, provides that a defendant in a criminal action is entitled to be confronted with the witnesses against him in the presence of the court, except, testimony taken at the preliminary examination, and testimony of a witness taken conditionally, in which cases the testimony may be read upon proof that the witness is dead. This section seems to be a regulation upon the subject of the introduction of testimony given in former proceedings, the subject being one where the rights of a defendant in a

criminal action would preclude the use of testimony in former actions unless specifically authorized by statute, and the Legislature having undertaken to provide when and how such testimony may be used in a criminal case, the statute will be presumed to be comprehensive and exclusive and constitute the exception made in section 1102 that where the provision is made in the Penal Code, the rules of evidence applicable to civil actions do not apply.'' (See *Werner* v. *State Bar*, 24 Cal.2d 611, 615 [150 P.2d 892]; see also *People* v. *Bird*, 132 Cal. 261 [64 P. 259] which was filed prior to the 1911 amendment to section 686 of the Penal Code.)

In any event in this case it is clear that a coroner's inquest proceeding is not a former action as that term is used in the pertinent code section and it is not in any true sense an action between the same parties.

Furthermore, in this case the record discloses that the defendant at all times knew where William Rowe was located and had he desired to have the testimony of the boy at the trial he could have examined him on commission under the provisions of sections 1349 through 1362 of the Penal Code. This was not done and when the prosecution made an offer to cooperate in this respect the offer was not accepted by the defendant. The prosecution was precluded from conducting such an examination on its own initiative by section 1335 of the Penal Code as this was a murder case in which the punishment might have been death. There was no explanation by the defendant as to why he and Mrs. Rowe had permitted the boy, who apparently was the only eyewitness to the episode in question, to leave the State of California nor was there any explanation as to why an effort had not been made to have the witness present at the trial. There was no offer or proof made and as a consequence there is nothing in the record before us upon which we can determine whether its exclusion prejudiced the rights of the appellant.

The record in this case is clear.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied July 26, 1960, and appellant's petition for a hearing by the Supreme Court was denied September 11, 1960.